**Antonio R. GONZALES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–89–00393–CR.**

Court of Appeals of Texas,
San Antonio.

Dec. 5, 1991.

Rehearing Denied Jan. 15, 1992.

Larry Zinn, San Antonio, for appellant.

Fred G. Rodriguez, Former Crim. Dist. Atty., Steven G. Hilbig, Crim. Dist. Atty., Diana Cruz, Wendelyn Rush, Barbara Hervey, Asst. Crim. Dist. Attys., San Antonio, for appellee.

Before REEVES, C.J., and BUTTS and PEEPLES, JJ.

REEVES, Chief Justice.

This is an appeal from a judgment based on a jury verdict of guilty of aggravated sexual assault. The trial court assessed a sentence of 99 years to be served consecutively with another 99 year sentence. Appellant asserts trial court error in the following:

1. allowing the child complainant to testify by means of a closed-circuit television under TEX.CODE CRIM.PROC. ANN. art. 38.071 because the procedures of the statute were not followed;

2. allowing the closed-circuit testimony because the procedure violates the confrontation and the due process clauses of the United States and Texas Constitutions;

3. admitting hearsay under TEX.CODE CRIM.PROC.ANN. art. 38.072 (hearsay statement of a child violates the confrontation and due process clauses of the United States and Texas Constitutions); and

4. admitting alleged similar extraneous acts.

Appellant was indicted for sexually assaulting his seven year old stepson, J.M.

The State filed a motion to allow J.M. to testify by closed-circuit television, alleging that the boy was now undergoing psychological treatment as a result of appellant's acts of assault, and that he was very intimidated by appellant. After a hearing outside the presence of the jury, the trial court ordered that testimony be given by two-way closed-circuit television.

The closed-circuit system had two complete units, audio and visual. One unit was situated in the courtroom where it could be viewed and heard by the judge, jury, defendant, and counsel for both sides. Another identical system was located in a second room where J.M. and a child advocate employed by the district attorney were situated.[1] All participants in the trial were able to see and hear each other. It was through this set-up that J.M. testified.

Appellant contends it was error for the trial court to permit J.M.'s testimony in this manner since TEX.CODE CRIM. PROC.ANN. art. 38.071, § 3 at the time of trial provided for one-way closed-circuit testimony with counsel for both sides allowed in the same room with the child. Therefore, appellant urges that since the legislature had not specifically provided for this method of testimony, it was error for the trial court to allow another method. He further argues that the statute, both facially and as applied to this case, is unconstitutional because it violated his right of confrontation under the constitutions of the United States and Texas.

In *Gonzales v. State*, 818 S.W.2d 756 (Tex.Crim.App.1991), this same appellant challenged his conviction for the murder of J.M.'s sister. His surviving sister, Yolanda, testified by way of an identical closed circuit audio-visual procedure. Appellant objected to the use of that method, alleging, in part, that murder was not one of the offenses listed in art. 38.071.[2] The Court held that the resolution of that contention was unnecessary, holding, the "central le-

---

1. This room is situated in a part of the courthouse that has been designated for use of the district attorney.

2. Art. 38.071, § 1 provides a list of sex offenses committed against a child 12 years of age or younger.

gal issue is the same with or without reference to article 38.071(3); the question being did the State's prosecutorial innovation violate the defendant's right to confrontation." *Id.* at 765. The court reasoned that the courts as well as the legislature could adopt procedures to protect children who are called to testify in court. Judge Benavides, in his concurring opinion stated, "the question whether an alternative testimonial procedure is offensive to the constitutional confrontation guarantees ultimately has nothing whatever to do with the statute purporting to authorize it." *Gonzales,* 818 S.W.2d at 767 (Benavides, J., concurring).

But the court held that before an accused gave up the right of a face-to-face confrontation with the accuser, there must be an adequate showing of necessity. In making this declaration, the Court specifically adopted the holding of the United State Supreme Court in *Maryland v. Craig,* 497 U.S. ——, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). In *Craig,* the Court acknowledged that face-to-face confrontation forms " 'the core of the values furthered by the Confrontation Clause,' " and stated that:

Given the State's traditional and transcendent interest in protecting the welfare of children and buttressed by the growing body of academic literature documenting the psychological trauma suffered by child abuse victims who must testify in court, we will not second guess the considered judgment of the Maryland Legislature regarding the importance of its interest in protecting child abuse victims from the emotional trauma of testifying. Accordingly, we hold that if the State makes an adequate showing of necessity, the state interest in protecting child abuse witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify use of a special procedure that permits a child in such cases to testify at trial against the defendant in the absence of face-to-face confrontation with the defendant.

The majority in *Gonzales,* continuing to quote from *Craig,* stated,

The Court emphasized, however, the finding of 'necessity' must be on a case

by case basis. '[T]he trial court must hear evidence and determine': *First,* 'whether use of the one-way closed-circuit procedure is necessary to protect the welfare of the particular child witness who seeks to testify.' ((citations omitted)). *Second,* the trial court must also find 'that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant.' (citations omitted). *Third* and finally, the trial court must determine that the emotional distress suffered by the child witness in the presence of the defendant is 'more than de minimis, i.e., more than mere nervousness or excitement or some reluctance to testify.'

*Gonzales,* 818 S.W.2d at 762.

Turning to the constitution of Texas, and taking into consideration that in *Gonzales* the State used a two-way television device, the Court stated,

Taking into account first, that there was confrontation in the form of cross-examination in the case before us, and second, the exigencies of the particular case before us, we will not read the right to confrontation guaranteed under our State Constitution as affording appellant the right to face-to-face confrontation. In short, we will use the same analysis applied in *Craig* to determine if the State Constitution has been violated in the case before us.

*Gonzales,* 818 S.W.2d at 764. In compliance with *Gonzales,* we will, of course, follow the same procedure.

On July 17, 1989, the trial court held a hearing on the State's motion to use closed circuit television equipment. Janie Ramos, J.M.'s grandmother, testified that J.M. along with several siblings had been living with her for two years since the murder of their sister by appellant. Mrs. Ramos stated that not only did J.M. witness his sister's murder but also that appellant threatened to kill him several times. She further testified that due to J.M.'s fear of appellant he had trouble sleeping at night and often cried throughout the evening. Mrs. Ramos testified that she did not think that he would be able to testify in the courtroom

with the appellant being present because he was very scared and his nerves were very bad.

Dr. Robert Cortner, a clinical psychologist, testified that J.M. had been referred to him by the Department of Human Services for an evaluation to determine the effect of his sibling's death on him, what his psychological condition was, and what kind of help he might need. Dr. Cortner had seen J.M. 33 times prior to testifying in court. He testified that J.M. revealed to him that he was afraid of appellant because, "appellant hits him all the time." J.M. also told Dr. Cortner he experienced multiple nightmares and in particular dreamed that appellant would kill him. The child told Dr. Cortner that appellant had killed his sister with a "big fat stick" by hitting her on the head with it. He told Dr. Cortner on his tenth visit that "Tony [appellant] stuck his thing in his butt many times." J.M. told Cortner that this happened "too many times to count." Cortner testified that J.M. informed him that appellant would abuse him "in the night and in the day" and that when he would run away from appellant, appellant would catch him and he would just cry. J.M. told Dr. Cortner that no one would ever try to stop Tony "because Tony would kill them." Further, "Tony told J.M. he would kill him if he told anyone." In Dr. Cortner's opinion, the child was completely convinced that appellant would carry out his threats.

When referring to his life with appellant, the child would fluctuate between anger and sadness. With regard to the child's ability to testify in the courtroom, Dr. Cortner testified that in his opinion he would probably not talk. Furthermore, he stated that testifying would have a lot of adverse psychological effects on J.M. Dr. Cortner testified that he was afraid that J.M. would be thrown back into a serious post-traumatic stress syndrome which J.M. has not yet worked through.

Robert Hogue, a criminal investigator for the Bexar County District Attorney's office also testified. Hogue's primary function was to operate the Multi-media Information Network Exchange (the MINKS system). He stated that the system was initially designed and used so that children could testify from a remote site and still satisfy the defendant's legal rights of confrontation. He described the system as a combination of electronic pieces of equipment consisting of two work stations and remote television sets. He stated that a work station consisted of a device that resembled a television set. It was different in that it allowed not only audio but also video on a two-way basis. An individual who sat in front of the primary station could see and hear someone from a remote site talking to him or her at the other work station. Similarly, an individual situated in front of the remote station could see and hear someone from the primary site. The individual monitors are designed so that other persons can monitor what is going on at both sites.

At the close of the testimony which has been summarized above, the trial court ruled that the procedure would be implemented.

After conviction and notice of appeal in this case, the State filed a motion to supplement the transcript with a certified copy of the findings of fact and conclusions of law, along with a certified copy of the motion. The copy recites that the findings were made by the court on July 17, 1989 (at trial) but were signed and entered September 8, 1989.

Appellant opposed the motion contending that no request for findings of fact was made, and that he was not notified of any hearing requesting the court to make findings on the hearing. He also seems to question the authenticity of the date the findings were signed and entered. Appellant did not question the accuracy of the findings. Prior to oral argument, this court denied the motion to supplement the transcript. The order denying the motion was improvident and is withdrawn. Both *Craig* and *Gonzales* mandate that the trial court make findings in support of its decision to use this type of procedure. If the trial court had made no findings of fact and conclusions of law, it would have been in-

cumbent on this court to abate the appeal and order the trial court to do so.[3]

The trial judge made the following findings of fact and conclusions of law:

1. The defendant, Antonio Gonzales, is charged with the offense of aggravated sexual assault of a child alleged to have occurred on August 1, 1987;

2. The complainant in the case, (J.M.), is a male, child, age 9, the stepson of the Defendant;

3. The State presented testimony of Jane Espinosa Ramos, the maternal grandmother of the child, J.M. She testified that J.M. had told her that the Defendant had killed J.M.'s sister, Yvette and that the Defendant pointed a gun at J.M. and told him he would kill J.M. and the other children if he said anything about it;

4. Mrs. Ramos further testified that J.M. had been sexually assaulted by the Defendant and that the Defendant had threatened to hurt J.M. if he told anyone about the assaults;

5. Mrs. Ramos further testified that J.M. would awaken in the night and cry because he was afraid of coming to court and seeing the Defendant again;

6. Mrs. Ramos ultimately testified that J.M. would not be able to testify in the same room with the Defendant; 'He is very scared and his nerves are very bad.';

7. The State called Dr. Robert H. Cortner, PhD and qualified him as an expert witness (clinical psychologist);

8. Dr. Cortner testified that in his therapy sessions with J.M., J.M. had stated to him that he was afraid of the Defendant because 'he hits me all the time,' and that he has recurrent dreams that the Defendant was going to kill him;

9. Dr. Cortner offered his expert opinion that were J.M. to testify in the same room as the Defendant, J.M. would be so fearful that he would probably 'block

emotionally' and probably would not talk; and

10. Dr. Cortner testified that he believed that if J.M. testified in the presence of the defendant, J.M.'s gains in therapy would be destroyed.[4] ...

The trial court's conclusions of law determined that J.M. was "unavailable to testify in open court because the unrefuted testimony presented by the State indicates that the child would suffer undue psychological harm through his involvement at the trial." The court further found that the system "provides for instantaneous two-way communication, the rights of the Defendant, and specifically the right of confrontation and cross-examination under the Sixth and Fourteenth Amendments to the U.S. Constitution and Article 1, Section 10 of the Texas Constitution are not violated."

We find that the findings of fact adequately reflect the evidence at the hearing, and that the confrontation rights of appellant have been adequately protected.

■ Appellant has cited no authority for his assertion that he was denied due process or due course of law because the state did not produce J.M. for interrogation prior to trial. A review of the transcript reveals that appellant filed a Motion to Take Deposition on July 17, 1989, the date of the trial. TEX.R.CRIM.PROC.ANN. art. 39.02 (Vernon 1981) provides the following:

> Depositions of witnesses may be taken by the defendant. When the defendant desires to take the deposition he shall ... file with the clerk of the court ... an affidavit stating the facts necessary to constitute a good reason for taking the same, and an application to take the same....

The unsworn motion does not contain an affidavit stating the facts necessary to show good cause for taking the complainant's deposition nor does it contain an appli-

---

**3.** This is a similar procedure to that required pursuant to TEX.CODE CRIM.PROC.ANN. art. 38.22, § 6.

**4.** The trial court also made findings concerning the testimony of the operator of the closed cir-

cuit two-way television equipment to be used, its ability for two-way instant audio and visual communication, clarity, and other characteristics of the equipment, including where it would be situated.

cation for the same. A defendant's motion to take a deposition of a witness, which does not have an affidavit attached and is not verified, is insufficient to meet the requirements of article 39.02. *State ex. rel. Simmons v. Moore,* 774 S.W.2d 711, 714 (Tex.App.—El Paso 1989, no pet.).

Appellant complains that J.M. testified from a small room with only a child advocate from the district attorney's office present. A review of the statement of fact reveals that J.M. appeared responsive to both direct and cross-examination with no assistance from the child advocate. Appellant was afforded ample opportunity during J.M.'s appearance through the two-way system to cross-examine him. His cross-examination, which consists of approximately two pages in the record, dealt with whether it would frighten J.M. if he talked to appellant's counsel outside the presence of appellant. We are unaware of any legal requirement, save that of deposition, that a potential adverse witness talk to opposing counsel prior to trial.

■ Appellant also asserts that article 38.071 § 3 violates the due process clauses of United States and Texas constitutions.[5] We find the court's dissertation in *Long v. State,* 742 S.W.2d 302, 319–20 (Tex.Crim. App.1987), *overruled on other grounds, Briggs v. State,* 789 S.W.2d 918 (Tex.Crim. App.1990), *cert. denied,* 485 U.S. 993, 108 S.Ct. 1301, 99 L.Ed.2d 511 (1988) helpful. Judge Duncan stated:

> ... Historically, the due course of law clause in Art. I § 19 of the Texas Constitution has been equated and deemed synonymous with the guarantee of due process under the Fourteenth Amendment. *Mabee v. McDonald,* [107 Tex. 139] 175 S.W. 676 (Tex.1915). As recent as 1982, however, the United States Supreme Court commented that Art. I, § 19, *supra* 'is different from, and arguably significantly broader than ...,' *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 293, 102 S.Ct. 1070, 1077, 71 L.Ed.2d 152 (1982), the comparable Fourteenth Amendment. Such an expan-

sive distinction is not necessary.... What is necessary ... is that the rights guaranteed to be protected from deprivation are identical: life, liberty, and property.

> Due process does not lend itself to simple, concise definitions. In its most basic sense due process is the impediment that is constitutionally imposed on governmental conduct that offends our fundamental rights.... In other words, due process is in itself essentially the same as fairness.... Accordingly, 'a fair trial in a fair tribunal is a basic requirement of due process.' *In Re Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1965) at 136 [75 S.Ct. at 625].

*Id.* at 319–20.

Appellant bases his denial of a fair trial on two contentions: (1) permitting J.M. to testify outside the physical presence of appellant raised an inference or presumption of guilt, and (2) he was denied access to J.M. prior to the trial.

We again refer to *Craig,* wherein the court directs us to the responsibility of the state to protect the welfare of children and a growing realization of the psychological trauma suffered by child abuse victims who must testify in court. The trial judge carefully instructed the jury that:

> "[you] may not draw any adverse inferences against the defendant from the fact that the Court allowed the State to utilize this closed-circuit system. The defendant is presumed innocent, you may not use, in any manner, the fact a witness for the State testified by way of closed circuit system in determining the guilt or innocence of the defendant. You may only consider what was testified to by the witnesses. The manner in which that testimony is brought before you is not relevant and should not be considered during your deliberations."

We have been unable to find Texas authority on this point. But Texas has long recognized the need to vary the manner of courtroom testimony upon a showing of necessity. *See Culverhouse v. State,* 755

---

5. Although we have found that implementation art. 38.071 § 3 was not necessary to the proce-

dure actually used, we will address the point of error.

S.W.2d 856 (Tex.Crim.App.1988), *cert. denied*, 488 U.S. 863, 109 S.Ct. 164, 102 L.Ed.2d 134 (1988) (upon showing of necessity, trial court did not abuse its discretion in ordering defendant to appear in court in shackles and handcuffs). In *Wildermuth v. State*, 310 Md. 496, 530 A.2d 275, 292 (Ct.App.1987) it was held that, upon showing that a child's testimony in open court would cause the child emotional distress, the child's testimony given in a similar manner as in this case did not deny the defendant's presumption of innocence and, thereby, federal due process.

Appellant contends that TEX.CODE CRIM.PROC.ANN. art. 38.072[6] also violates the confrontation clauses of the United States and the Texas constitutions, the federal due process clause and the Texas due course clause. In *Buckley v. State*, 786 S.W.2d 357 (Tex.Crim.App.1990), the Court found that TEX.CODE CRIM.PROC. ANN. art. 38.072 did not facially violate the confrontation clauses of the federal or state constitution. Similarly, we are of the opinion that appellant has not been denied his constitutional right of due process under the United States Constitution nor his right of due course of law under the Texas Constitution.

■ Lastly, we consider the contention that the trial court erred in admitting evidence of extraneous offenses. J.M. testified to the assault alleged in the indictment. Appellant contends that the "outcry" mentioned other extraneous acts of

6. TEX.CODE CRIM.PROC.ANN. art. 38.072 provides: Sec. 1 This article applies to a proceeding in the prosecution of an offense under any of the following provisions of the Penal Code, if committed against a child 12 years of age or younger.
(1) Chapter 21 (Sexual Assault Offenses) or 22 (Assaultive Offenses) Sec. 2(a) This article applies only to statements that describe the alleged offense that:
　(1) were made by the child against whom the offense was allegedly committed; and
　(2) were made to the first person, 18 years of age or older, other than the defendant, to whom the child made a statement about the offense.
(b) A statement that meets the requirements of Subsection (a) of this article is not inadmissable because of the hearsay rule if:

sexual assault. Outside of the hearing of the jury the following colloquy occurred:

THE COURT: Okay, the jury is out. Make your objection for the record, exactly what you told me here. I didn't hear you half of the time.

MR. NORMAN (Defense Counsel): The defense would object to any testimony by Doctor Cortner as to hearsay statements—which are hearsay statements of J.M. regarding accounts of alleged misconduct on the part of the defendant, other than that the act allegedly—that is made a basis of the indictment for which he is on trial here.

The State is proposing to elicit from Doctor Cortner testimony that J.M. made reference to a multitude of previous assaults by the defendant at unspecified times.

And under the rules of criminal evidence, the allegations of misconduct or other occasions are not admissible to prove or—the propensity of the defendant to have admitted to have committed the offense that's alleged in the indictment and for which he is on trial.

And statements—the fact that J.M. made an outcry, that he told Doctor Cortner that he had been assaulted, should—Doctor Cortner's testimony should be limited to that simple—to that evidence only and not to any other incidents—not to the fact that there were a multitude of incidents.

THE COURT: What says the State?

(1) on or about the 14th day before the date the proceeding begins, the party intending to offer the statement:
　(A) notifies the adverse party of its intention to do so;
　(B) provides the adverse party with the name of the witness through whom it intends to offer the statement; and
　(C) provides the adverse party with a written summary of the statement;
(2) the trial court finds in a hearing conducted out side of the presence of the jury, that the statement is reliable based on the time, content, and circumstances of the statement; and
(3) the child testifies or is available to testify at the proceeding in court or in any other manner provided by law.

MS. CRUZ: Your Honor, the statements from Doctor Cortner is the outcry statement. This is basically what the child said to Doctor Cortner.

THE COURT: That's what's in the statement that you furnished to the defense.

MS. CRUZ: Yes, Your Honor. I believe we can rely to that statement as to what the child said when he outcried for the first time with regard to the details. I believe we can do that.

MR. NORMAN: The statement does not contain details regarding anything that happened August 1, 1987, which is what—

THE COURT: Let me see the statement, please.

THE COURT: Okay. The objection will be overruled. You may except to the Court's ruling.

MR. NORMAN: We'll except to the Court's ruling and—for the reasons we previously stated. That the evidence of any acts of misconduct other than those that occurred on or about August 1st, 1987 are irrelevant and their admission into evidence would be contrary to the rules of criminal evidence.

When the jury returned to the courtroom, Dr. Cortner testified, in pertinent part:

Q. (by Ms. Cruz) What did he say that Tony had done to him?

A. I wrote the affidavit based on the notes I had taken that day, .... And the affidavit I turned in is what I said. On 9–6–88, he said, "Tony stuck his thing in his butt many times."

I said, "How many?" he said, "Too many times to count." I asked—

MR. NORMAN: Your Honor, again, we would object to this testimony on the grounds that it does not refer to the incident that's alleged in the indictment. It falls outside the scope of 38.072—article 38.072, which is the hearsay outcry exception to the rule. And, therefore, is inadmissible.

THE COURT: The objection will be overruled.

MS. CRUZ: And what else did J.M. tell you had happened to him?

Q. So, I asked him, "When did he do it, at night or during the day?" And he said, quote, "he did it to me in the night and in the day." ...

To determine the admissibility and relevancy of the alleged extraneous acts, we turn to the Texas Rules of Criminal Evidence. "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401. "All relevant evidence is admissible, except as otherwise provided." Rule 402. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Rule 403. Rule 404 provides for the inclusion and exclusion of evidence of pertinent character traits of an accused and the limited admissibility of evidence of other crimes, wrongs, or acts of the accused. Our court of criminal appeals analyzed these rules and their application to extraneous offenses in *Montgomery v. State*, 810 S.W.2d 372 (Tex.Crim. App.1991) (opinion on rehearing). Speaking to the admissability of extraneous offenses, the Court stated:

> The approach under Rule 403 is to *admit relevant evidence* unless the probative value of that relevant evidence is *substantially* outweighed by the danger of unfair prejudice to a defendant. Thus, Rule 403 favors admissibility of relevant evidence and the presumption is that relevant evidence will be more probative than prejudicial. If the trial court determines that the evidence of other crimes, wrongs, or acts has relevance apart from character conformity, he should admit the evidence absent a further objection by the opponent of the evidence. The opponent's earlier objection that the evidence has no relevance beyond character conformity, and is therefore inadmissible under Rule 404(b) has been ruled upon. It is now incumbent upon him, in view of the presumption of admissibility of relevant evidence, to ask the court to exclude the evidence by its authority under Rule 403, on the ground that the probative

value of the evidence, assuming it is relevant apart from character conformity, is nevertheless substantially outweighed by, *e.g.*, the danger of unfair prejudice. *Id.* at 389 (citation omitted). Because the objection in the trial court was not specific, error has not been preserved. TEX. R.APP.P. 52(a).

The judgment of the trial court is affirmed.

