Jeffrey Steven MARX, Appellant,

v.

The STATE of Texas, Appellee.

No. 03–95–00333–CR.

Court of Appeals of Texas,
Austin.

July 3, 1997.

F. N. "Trey" Brown, III, Burnet, for Appellant.

Sam Oatman, Dist. Atty., John Morgan Minton, Asst. Dist. Atty., Llano, for Appellee.

Before CARROLL, C.J., and KIDD and B.A. SMITH, JJ.

BEA ANN SMITH, Justice.

A jury convicted appellant, Jeffrey Steven Marx, of aggravated sexual assault of a child and assessed punishment at imprisonment for twenty-three years. *See* Tex. Penal Code §§ 22.011, 22.021 (West 1994 & Supp.1997). Marx brings seven points of error contending the trial court erred by: (1) allowing two child witnesses to testify by closed-circuit television; (2) not suppressing his confession; (3) failing to afford him a *Batson* hearing; (4) denying him six challenges for cause; (5) admitting evidence of extraneous wrongs; (6) not allowing cross-examination of the victim concerning possibly exculpatory evidence; and (7) allowing testimony by witnesses not on the prosecution's witness list who were present in the courtroom during other testimony after the rule had been invoked. We will affirm the conviction.

### FACTUAL AND PROCEDURAL BACKGROUND

In August 1994, thirteen-year-old B.J. told her grandfather and caseworkers at the children's advocacy center that Jeffrey Marx had sexually assaulted her earlier that summer. The next day, Investigator Jimmy Hopkins of the Burnet County Sheriff's Department obtained a warrant for Marx's arrest. While in custody, Marx confessed to having intercourse with B.J. when he and his wife took B.J. swimming at an area lake. He also admitted to engaging in sexual acts with four other girls, including two of his daughters and his niece J.M. Because Marx claimed he could not read or write, Chief Deputy Tim Moody entered the confession into a computer. A Burnet County grand jury subsequently indicted Marx for three counts of aggravated sexual assault against B.J. Count one of the indictment alleged genital penetration; counts two and three alleged penetration of the anus and digital penetration of the genitals, respectively.

Before trial, Marx filed two motions to suppress the confession, which he contended was taken in violation of his statutory and constitutional rights. *See* U.S. Const. amend. IV, XIV; Tex. Const. art. I, § 9; Tex.Code Crim. Proc. Ann. art. 38.22, § 2(a)(1–5) (West 1979). The trial court denied both motions. The prosecution filed a pretrial motion to allow B.J. and J.M., age six, to testify by two-way closed-circuit television. *See* Tex.Code Crim. Proc. Ann. § 38.071 (West Supp.1997). The trial court granted the State's motion. The jury found Marx guilty of count one but not guilty of counts two and three. The jury assessed punishment at twenty-three years of imprisonment.

### DISCUSSION

**Testimony by Closed–Circuit Television**

In point of error one, Marx contends the trial court erred by allowing the two girls to testify by closed-circuit television because such testimony: (1) did not meet the prerequisites of article 38.071; (2) as applied, violated his right to confront the witnesses; and (3) facially and as applied, violated his right to due process of law. *See* U.S. Const. amend. V, VI, XIV; Tex.Code Crim. Proc. Ann. art. 38.071.

### 1. Statutory Compliance and Confrontation Challenge

■■■ Section 1 of article 38.071 allows testimony to be given by closed-circuit television in a prosecution for aggravated sexual assault only if

the offense is alleged to have been committed against a child 12 years of age or younger and if the trial court finds that the child is unavailable to testify at the trial of the offense, and applies only to the statements or testimony of that child[.]

*Id.* art. 38.071, § 1. Marx correctly notes that B.J. was thirteen years old at the time of this offense and J.M. was not the victim in this particular proceeding. He also contends the State failed to prove J.M. was "unavailable" as the statute requires. However, in *Gonzales v. State,* 818 S.W.2d 756 (Tex.Crim.App. 1991), the Texas Court of Criminal Appeals upheld a child witness's testimony by closed-circuit television even though she was not the victim of the charged offense and even though the offense (murder) was not one enumerated in the statute. *See id.* at 765. *Gonzales* teaches that the statute is not the only basis for permitting closed-circuit testimony by a child victim in Texas:

[W]e see no reason why an expression of this important public policy must necessarily be in the form of an act or statute. More importantly, we have found nothing in any pertinent opinion from this Court or from the Supreme Court that would permit only the Legislature to make this "public policy" determination on behalf of the State.

*Id. Gonzales* involved a challenge to closed-circuit televised testimony on the ground it violated the defendant's confrontation right. *See* U.S. Const. amend. VI. The court of criminal appeals expressly adopted the United States Supreme Court's holding in *Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), that the State has a sufficiently important interest in protecting child victims from the traumatic effects of testifying to justify the use of closed-circuit televised testimony under certain circumstances. *See Gonzales,* 818 S.W.2d at 765 (citing *Craig,* 497 U.S. at 855, 110 S.Ct. at 3168–69). To justify the procedure's use un-

der *Craig* and now *Gonzales,* the trial court must determine that the procedure is necessary by hearing evidence and finding: (1) the procedure is necessary to protect the welfare of the particular child witness who seeks to testify; (2) the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant; and (3) the emotional distress suffered by the child witness in the presence of the defendant is not de minimis ("more than mere nervousness or excitement or some reluctance to testify"). *Gonzales,* 818 S.W.2d at 765 (citing *Craig,* 497 U.S. at 855–56, 110 S.Ct. at 3168–69); *Hightower v. State,* 822 S.W.2d 48, 51 (Tex. Crim.App.1991). This finding of necessity supplants the requirement of unavailability described in article 38.071. *See* Tex.Code Crim. Proc. Ann. art. 38.071, § 8. Accordingly, as long as the record in this case supports the finding of necessity, the trial court did not err by allowing B.J. and J.M. to testify by closed-circuit television merely because they did not meet the other requirements of article 38.071.

■■■ We review the trial court's rulings in a hearing on necessity for an abuse of discretion. *See Hightower,* 822 S.W.2d at 53; *see also* Act of July 20, 1987, 70th Leg., 2d C.S., ch. 55, § 2, 1987 Tex. Gen. Laws 180, 185 (Tex.Code Crim. Proc. Ann. art. 38.071) (stating preference for affording "sufficient discretion" to trial courts applying statute). Review of a necessity hearing typically involves reviewing a trial court's findings of fact. *See Hightower,* 822 S.W.2d at 53; *Gonzales v. State,* 822 S.W.2d 189, 194 (Tex. App.—San Antonio 1991), *pet. granted and remanded,* 831 S.W.2d 326 (Tex.Crim.App. 1992) (later case involving Gonzales with a second victim); *Dufrene v. State,* 853 S.W.2d 86, 90 (Tex.App.—Houston [14th Dist.] 1993, pet. ref'd). Here the trial court did not record findings of fact. However, Marx did not request and does not challenge the absence of such findings. Therefore, we will determine whether the record supports the trial court's ultimate determination of necessity.

B.J.'s grandfather, Barney Raines, with whom she lived at the time of the offense and at trial, testified that B.J. was sixty percent

mentally retarded. B.J. had told her grandfather that Marx had threatened her. Raines felt that B.J. would suffer emotionally, and perhaps physically, if she testified in court. B.J. was in a special class for learning disabled students. Her teacher, Pat Fluitt, testified that B.J. had the educational level of a six or seven-year-old. Fluitt also related that B.J. dreaded testifying and had complained that she could not face Marx.

J.M.'s mother, Crystal Hayden, took the stand to express her concern that testifying in court would be harmful and traumatic to J.M. The mother also testified that J.M. was wetting her bed and having nightmares, although these had occurred before J.M. had been asked to testify. J.M.'s therapist, Dr. Anita Calvert, testified that J.M. was "a wreck" and did not want to see Marx. Dr. Calvert also testified, however, that J.M. was a strong girl and "would probably testify okay" if she had to. When the court inquired whether Dr. Calvert thought testifying in court would cause J.M. any emotional or physical problems, Dr. Calvert answered "I couldn't say for sure that there would not be. I wouldn't expect it."

■■ In our opinion, this record supports the trial court's decision to permit the televised testimony of both child witnesses. Regarding the complainant B.J., the evidence was that she was very frightened of facing Marx in court and testifying in his presence would cause her to suffer psychological, perhaps even physical, harm. The trial court was justified in concluding the procedure was necessary to protect this fourteen-year-old victim who had the emotional maturity of a six or seven-year-old.

■ Although there is less compelling evidence of the emotional distress that the eyewitness J.M. would suffer from testifying in the defendant's presence, the trial court was entitled to consider her tender age of six years and the fact that J.M. herself had allegedly been sexually assaulted by the defendant. The trauma to a child victim of confronting a perpetrator in the courtroom is not necessarily diminished because the subject of her testimony is the defendant's assault on another victim. Indeed, *Gonzales* permitted closed-circuit testimony by a child

witness who had allegedly been sexually assaulted by the defendant. *See* 818 S.W.2d at 765.

After the trial court found it necessary to allow the complainant to testify by closed-circuit television, it may have determined that it would be less of a comment on the defendant's guilt or innocence to have both children testify in the same manner. To allow the fourteen-year-old complainant but not the six-year-old eyewitness to give closed-circuit testimony may have endangered the defendant's presumption of innocence more by emphasizing that the complainant alone needed special protection from this defendant.

■ Finally, we note that in *Craig* the Supreme Court was reviewing the constitutionality of a statute that allowed alternative testimony only if the child's trauma was "such that the child cannot reasonably communicate." *Craig*, 497 U.S. at 856, 110 S.Ct. at 3169. But in finding that statute constitutional, the Court did not hold that a child witness's trauma must always rise to that level before closed-circuit testimony is constitutionally permissible. *Craig*, and accordingly *Gonzales*, require only that the emotional distress be caused by the defendant's presence and not the courtroom generally, and that the trauma be "more than mere nervousness or excitement or some reluctance to testify." *Id.*; *Gonzales*, 818 S.W.2d at 762. In light of this standard and the conflicting testimony regarding J.M.'s ability to testify in the defendant's presence, we conclude that the trial judge adequately balanced the defendant's constitutional rights against the state's interest in protecting these children from being further victimized. The trial judge was entitled to determine the weight and the credibility to be afforded the testimony regarding the level of J.M.'s emotional distress; likewise, the trial judge could have found it preferable to afford the same protection to both child-witnesses, rather than single out the complainant B.J. for seemingly special protection from the defendant. We hold that the trial court did not abuse its discretion by allowing the alternative testimonial procedure for both children.

## 2. *Due Process of Law*

Marx also asserts that the use of closed-circuit televised testimony deprives criminal defendants of their constitutional guarantee to be presumed innocent under the Due Process Clause of the Fifth and Fourteenth Amendments. *See* U.S. Const. amend. V, XIV.[1] He contends that a jury viewing the modified manner of testimony will necessarily infer from the State's protection of the witness that the defendant must have harmed the witness in some way. Marx challenges the *practice* of closed-circuit testimony, whether authorized by statute or by judicial discretion. Neither the court of criminal appeals nor the United States Supreme Court has addressed this specific constitutional challenge.

The presumption of innocence underlies the criminal defendant's right to a fair trial. *Holbrook v. Flynn,* 475 U.S. 560, 567, 106 S.Ct. 1340, 1344–45, 89 L.Ed.2d 525 (1986); *Taylor v. Kentucky,* 436 U.S. 478, 479, 98 S.Ct. 1930, 1931–32, 56 L.Ed.2d 468 (1978); *Estelle v. Williams,* 425 U.S. 501, 503, 96 S.Ct. 1691, 1692–93, 48 L.Ed.2d 126 (1976). The presumption embodies the principle that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Flynn,* 475 U.S. at 567, 106 S.Ct. at 1345 (quoting *Taylor,* 436 U.S. at 485, 98 S.Ct. at 1934–35). Although the State cannot eliminate from trial every reminder that it has chosen to seek conviction and punishment against a particular person, "certain practices pose such a threat to the 'fairness of the fact-finding process' that they must be subjected to 'close judicial scrutiny.' " *Id.* at 568, 106 S.Ct. at 1345.

■ To constitute reversible error based on the deprivation of a fair trial, the defendant must show that some courtroom procedure entailed either actual prejudice or inherent prejudice—"such a probability that prejudice will result that it is deemed inherently lacking in due process." *Estes v. Tex-*

*as,* 381 U.S. 532, 542–43, 85 S.Ct. 1628, 1633, 14 L.Ed.2d 543 (1965). Specific challenges based on the right to be presumed innocent require a finding that the challenged practice creates "an unacceptable risk of impermissible factors" tending to erode the presumption of innocence. *Coy v. Iowa,* 487 U.S. 1012, 1034, 108 S.Ct. 2798, 2809–10, 101 L.Ed.2d 857 (1988) (Blackmun, J., dissenting); *Flynn,* 475 U.S. at 570, 106 S.Ct. at 1346–47; *Williams,* 425 U.S. at 505, 96 S.Ct. at 1693–94.

■ Even a procedure found to be inherently prejudicial, however, may be justified if it furthers an essential state interest. *Flynn,* 475 U.S. at 568–69, 106 S.Ct. at 1345–46. In *Flynn,* the Court upheld the presence of four uniformed state troopers in the front row throughout the trial of six defendants accused of a massive bank robbery. *Id.* at 568, 106 S.Ct. at 1345–46. The Court reasoned that because the jury more likely thought the guards' presence was to maintain courtroom order, the State's interest in maintaining custody over the defendants, who had been denied bail, overrode any slight prejudice that may have existed in the jurors' minds. *Id.* at 571–72, 106 S.Ct. at 1347–48. Conversely, in *Williams,* the Court held that the defendant's wearing prison clothing in the courtroom, when the defendant had requested civilian clothing, violated his due process rights because the clothing was "so likely to be a continuing influence throughout the trial" on the jury's judgment and furthered no essential state policy. *Williams,* 425 U.S. at 505, 96 S.Ct. at 1693–94. Likewise, the Texas Court of Criminal Appeals held that, without evidence of violence or threatened violence during trial, even the gruesome nature of the crime alleged against the defendant would not justify the use of shackles in front of the jury. *Long v. State,* 823 S.W.2d 259, 283 (Tex.Crim.App.1991), *cert. denied,* 505 U.S. 1224, 112 S.Ct. 3042, 120 L.Ed.2d 910 (1992). But where the evidence overwhelmingly indicated that extreme measures were necessary to protect those present in the courtroom, the court upheld the use of handcuffs and leg irons on a defendant during the punishment phase of

---

1. Marx does not bring a separate challenge un- der the Texas Constitution.

the trial. *Marquez v. State*, 725 S.W.2d 217, 228–30 (Tex.Crim.App.), *cert. denied*, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987); *see also Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970).[2]

Marx claims the practice of testimony by closed-circuit television is inherently prejudicial. Our evaluation of this challenge must be based on reason, principle, and common human experience. *Williams*, 425 U.S. at 504, 96 S.Ct. at 1693. In *Coy v. Iowa*, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), Justice Blackmun, in a dissenting opinion, addressed a similar argument that the trial court's use of a screen between the child witness and the defendant violated the defendant's right to be presumed innocent. *See id.* at 1034, 108 S.Ct. at 2809–10 (Blackmun, J., dissenting).[3] He concluded that the use of the screen was not inherently prejudicial:

> Unlike clothing the defendant in prison garb, or having the defendant shackled and gagged, using the screening device did not brand appellant with an unmistakable mark of guilt. A screen is not the sort of trapping that generally is associated with those who have been convicted. It is therefore unlikely that the use of the screen had a subconscious effect on the jury's attitude toward appellant.

*Id.* at 1034–35, 108 S.Ct. at 2810 (citations omitted). Blackmun also noted that the trial court instructed the jury not to allow the screen to influence the verdict in any way. *Id.* at 1035, 108 S.Ct. at 2810.

Unlike the mere use of a screen as in *Coy*, closed-circuit testimony completely removes the child from the courtroom and prevents the child from seeing or hearing the defendant at all. The use of this uncommon, expensive, and elaborate procedure in a child abuse case may create an inference of the defendant's guilt in the jurors' minds. *See generally* Ralph H. Kohlmann, *The Presumption of Innocence: Patching the Tattered Cloak After* Maryland v. Craig, 27 St. Mary's Law Journal 389, 412 (1996) ("Kohlmann") (arguing alternative testimonial procedures "have the effect of placing shackles on the defendant in the eyes of the jury"); Robert H. King, Jr., *The Molested Child Witness and the Constitution: Should the Bill of Rights Be Transformed into the Bill of Preferences?*, 53 Ohio St. L.J. 49, 97 (1992) (testimony by closed circuit television poses substantial risk of erosion of presumption of innocence). *But see Wildermuth v. State*, 310 Md. 496, 530 A.2d 275, 292 (Ct.App.1987) (finding jury likely assumed procedure was used to reduce trauma *any* child might suffer through public testimony).

However, the defendant's right to be presumed innocent is not absolute; even an inherently prejudicial practice may be constitutionally permissible if there is an overriding state interest that requires it. *See Craig*, 497 U.S. at 844, 849, 110 S.Ct. at 3162–63, 3165–66; *Flynn*, 475 U.S. at 571–72, 106 S.Ct. at 1347–48; *Marquez*, 725 S.W.2d at 230. In *Craig* and *Gonzales*, the essential state interest of protecting child witnesses from the trauma of testifying was found sufficiently important to justify an exception to the defendant's confrontation right. In *Craig*, the Court stated:

> Given the State's traditional and 'transcendent interest' in protecting the welfare of children,' and buttressed by the growing body of academic literature documenting the psychological trauma suffered by child abuse victims who must testify in court, we will not second-guess the considered judgment of the Maryland Legislature regarding the importance of its interest in protecting child abuse victims from the emotional trauma of testifying.

**2.** *Allen* involved the trial court's *removal* of the unruly defendant from the courtroom. Struggling with the defendant's confrontation right to be present at his trial, the Court stated "in some situations which we need not attempt to foresee, binding and gagging might possibly be the fairest and most reasonable way to handle a defendant who acts as Allen did here." *Allen*, 397 U.S. at 343, 90 S.Ct. at 1061.

**3.** The majority did not address the due process challenge because it reversed on confrontation grounds, although it contemplated a possible exception to the confrontation right might exist. *Coy*, 487 U.S. at 1020, 108 S.Ct. at 2802–03. Two years later the Court found that exception when it upheld Maryland's statute in *Craig*. *Craig*, 497 U.S. at 852, 110 S.Ct. at 3167.

*Craig,* 497 U.S. at 855, 110 S.Ct. at 3168–69; *see also Osborne v. Ohio,* 495 U.S. 103, 109, 110 S.Ct. 1691, 1696, 109 L.Ed.2d 98 (1990) ("It is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.' "). Both psychological and legal commentators recognize the traumatic effects of courtroom testimony on child victims. *See, e.g.,* Burgess & Holstrom, *The Child and Family During the Court Process,* in *Sexual Assault of Children and Adolescents* 205 (1978) (failure to protect child results in further traumatization by court procedures through which child must "relive" the sexual assault); Nancy W. Perry and Lawrence S. Wrightsman, *The Child Witness: Legal Issues and Dilemmas* 135–38 (1991) ("Even defense attorneys acknowledge that involvement in legal proceedings can be devastating to children.") (citation omitted); Libai, *The Protection of the Child Victim of a Sexual Offense in The Criminal Justice System,* 15 Wayne L.Rev. 977, 978–79 (1969); Beth McAllister, Comment, *Article 38.071 of the Texas Code of Criminal Procedure: A Legislative Response to the Needs of Children in the Courtroom,* 18 St. Mary's Law Journal 279, 295–97 (1986). In addition, the Texas Legislature has recognized a public policy of protecting child abuse victims from the harms of courtroom testimony. *See* Act of July 20, 1987, 70th Leg., 2d C.S., ch. 55, § 2, 1987 Tex. Gen. Laws 180, 185 (Tex.Code Crim. Proc. Ann. art. 38.071). Therefore, we are guided by *Craig, Gonzales,* the Texas Legislature, and the abundant literature on the harmful effects of eliciting courtroom testimony from child victims to hold that, when the trial court finds it is necessary for the individual witness's well-being, the use of closed-circuit televised testimony does not violate the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution. We are confident that trial courts will exercise caution and reason in balancing the defendant's important constitutional rights against the equally important state interest of protecting child victims from further victimization in the courtroom.

Because the procedure affects the defendant's presumption of innocence, however, its use warrants an additional jury instruction to minimize the potential prejudice the accused may suffer. In balancing a defendant's confrontation right in *Craig,* the Supreme Court also considered other means of assuring the reliability of witnesses' testimony and preserving the adversarial nature of the trial. *Craig,* 497 U.S. at 851, 110 S.Ct. at 3166–67. The Court reasoned that the essence of the confrontation right was safeguarded where the testimony's reliability was otherwise assured by rigorous cross-examination and other adversarial safeguards.[4] *Id.* The presumption of innocence involves the inferences that may be drawn from the State's accusations against and the manner of prosecution of the defendant.

> "[I]n a criminal case the term [presumption of innocence] ... cautions the jury to put away from their minds all the suspicion that arises from the arrest, the indictment, and the arraignment, and to reach their conclusion solely from the legal evidence adduced." ... [It cautions the jury to consider] *nothing but the evidence.*

*Taylor,* 436 U.S. at 484–85, 98 S.Ct. at 1934 (quoting 9 J. Wigmore, *Evidence* § 2511 (3d ed.1940)). Its importance has led to the policy of requiring trial judges in every criminal trial to impress upon juries the defendant's presumed innocence. *See Taylor,* 436 U.S. at 490, 98 S.Ct. at 1937. An additional instruction when closed-circuit television is used will strike an adequate balance between preserving the defendant's presumption of innocence and fostering the State's interest in protecting child victims.

In the present case, before the televised testimony began, the trial court stated to the jury:

> Ladies and gentlemen, I'm going to give you an instruction at this time. Our statutes provide that the testimony of children in these types of cases can be taken by what we call closed circuit television, and

---

4. The Court noted that the child witnesses testified under oath, were subject to full cross-examination, and were observed by the judge, jury, and defendant as they testified. *Craig,* 497 U.S. at 857, 110 S.Ct. at 3169–70.

that is what's going to be taking place here for the next couple of witnesses.

The court then explained how the procedure would work; he advised that the television would be turned on and off in order to hear objections. The court's explanation that "our statutes" allow the procedure in "these types of cases" likely conveyed to the jury the state's general desire to protect children from the intimidating courtroom demeanor rather than implying that the procedure was being used in this particular case due to circumstances involving this particular defendant. Although an additional instruction may have been desirable,[5] Marx did not request a special instruction and the statute did not apprise the court of a duty to give one. The trial court did generally instruct the jury to presume Marx's innocence before considering the evidence against him when it delivered the jury charge. We accordingly hold that the use of closed-circuit televised testimony was not unconstitutionally applied in this case. We overrule Marx's first point of error.

### *Batson* Challenges

In his second point of error, Marx contends the trial court erred by refusing to hold a *Batson* hearing on whether the prosecutor's peremptory challenges were racially motivated. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Keeton v. State*, 724 S.W.2d 58, 66 (Tex.Crim. App.1987). At jury voir dire and after each party exercised its challenges for cause, the State used two of its six peremptory challenges to strike two of three African–Americans on the venire.[6] The third African–American served on the jury. Marx objected that the strikes exercised against the two African–Americans were racially motivated, and asked the trial court to conduct a hearing. The trial court denied the motion because the defendant was not of the same race as the jurors who were struck. On February 6, 1997, we abated this appeal and ordered the trial court to hold a hearing to allow the

prosecutor to explain the reasons behind the peremptory challenges exercised against the two African–Americans. *See Powers v. Ohio*, 499 U.S. 400, 416, 111 S.Ct. 1364, 1373–74, 113 L.Ed.2d 411 (1991) (a defendant need not be of the same race as the wrongfully excluded jurors to make a cognizable *Batson* claim); *Linscomb v. State*, 829 S.W.2d 164, 166 (Tex.Crim.App.1992) (a defendant need only present relevant evidence with "more than a modicum of probative value" to merit a *Batson* hearing). The trial court held the hearing on March 18, 1997, and the supplemental transcript and statement of facts from that hearing have been forwarded to this Court. Marx has not provided us with supplemental briefing or a point of error contending the prosecutor's reasons given at the hearing were racially motivated. Therefore, having been granted the desired hearing, point of error two is now moot and may be overruled. In the interest of justice, however, we will address the point as including the argument that the prosecutor's professed reasons for the two peremptory strikes were pretexts for racially motivated exclusion of the African–American venire members.

At the *Batson* hearing, the prosecutor who tried the case testified under oath giving his reasons for striking the two African–American jurors, Myrtice Foster and James Louis Crawford. Based on his voir dire notes, he testified that he struck Ms. Foster because she claimed to be illiterate, having only a seventh-grade education. He testified he remembered learning that Mr. Crawford had possibly been arrested for burglary. Defense counsel attempted to impeach this testimony concerning Mr. Crawford with the prosecutor's prior statements, made the day after Marx requested and was denied the *Batson* hearing, that he struck Mr. Crawford because Mr. Crawford's comments at voir dire indicated he would be unable to make a decision in a case of this nature.

■ In reviewing a trial court's rulings at a *Batson* hearing, we determine whether the

---

**5.** *See* Kohlmann, *supra*, at 417. Kohlmann's article provides several proposed jury instructions and discusses the concerns that such an instruction should address. *See generally id.* at 416–419 nn. 129–133.

**6.** Because only twenty-eight persons remained on the venire after the parties made their challenges for cause, the State was permitted six, rather than the usual ten, peremptory challenges.

trial judge's decision was supported by the record so that it is not clearly erroneous. *See Vargas v. State*, 838 S.W.2d 552, 554 (Tex.Crim.App.1992). Under this "clear error" standard of review, we should defer to the trial court's decision unless we are left with a "definite and firm conviction that a mistake has been committed." *Id.* (quoting *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)). We apply this standard by considering the record, including the voir dire and the racial makeup of the venire, the prosecutor's neutral explanations, and appellant's rebuttal and impeaching evidence. *Id.*

■ We conclude that the trial court did not err in finding that the prosecutor's reasons for striking these two jurors were racially neutral.[7] The prosecutor's voir dire notes indicate that Ms. Foster claimed she was illiterate and had a seventh-grade education. In addition, both at the original proceeding and at this *Batson* hearing, the prosecutor gave racially neutral reasons for striking Mr. Crawford. The fact that the prosecutor gave different reasons at the recent hearing and two years earlier does not show that they were pretexts for racial discrimination; he could have had more than one reason and not communicated the possible burglary arrest at the original proceeding, since there was no formal *Batson* hearing. The record does show that Mr. Crawford had changed his position on whether he could presume the defendant innocent. It is not unusual that the prosecutor would forget this occurrence two years later but remember the possible arrest. Considering the voir dire record, the prosecutor's racially neutral reasons, and the fact that the third African–American on the venire actually served on the jury, we are not left with a firm conviction upon review of this record that the prosecutor's peremptory strikes were racially motivated. We overrule point of error two.

**Challenges for Cause**

■ In his third point of error, Marx contends the trial court erred in denying his challenges for cause against six venirepersons. In particular, Marx complains of rulings on his challenges to prospective jurors Ulbricht, Sharp, McGuire, Carlile, Clark, and Goble. The record shows that defense counsel properly preserved error by exercising six peremptory challenges to exclude these jurors, exhausting all of his peremptory challenges, and requesting six additional peremptory challenges that were denied. Marx contends he was forced to accept five objectionable jurors on the jury as the result of the trial court's error in overruling his challenges for cause. *See Felder v. State*, 758 S.W.2d 760, 766–67 (Tex.Crim.App.1988).

■ To prevail on a challenge for cause, the defendant must demonstrate either a bias against himself or against a rule of law upon which he was entitled to rely. *Cordova v. State*, 733 S.W.2d 175, 179 (Tex. Crim.App.1987), *cert. denied*, 487 U.S. 1240, 108 S.Ct. 2915, 101 L.Ed.2d 946 (1988). The trial court must determine whether the potential jurors' views would prevent or substantially impair their duties to act in accordance with the trial judge's instructions and jurors' oaths. *See Kemp v. State*, 846 S.W.2d 289 (Tex.Crim.App.1992), *cert. denied*, 508 U.S. 918, 113 S.Ct. 2361, 124 L.Ed.2d 268 (1993). The trial judge's determination, and our review, should be based on the voir dire examination of the prospective jurors *taken as a whole*. *Mooney v. State*, 817 S.W.2d 693, 701 (Tex.Crim.App.1991); *Cordova*, 733 S.W.2d at 179. A prospective juror who initially equivocates on her answers is not challengeable for cause if she ultimately states she can follow the trial court's instructions and render a verdict based on the evidence. *Adanandus v. State*, 866 S.W.2d 210 (Tex.Crim.App.1993), *cert. denied*, 510 U.S. 1215, 114 S.Ct. 1338, 127 L.Ed.2d 686 (1994).

---

7. At the *Batson* hearing ordered by this Court, the trial court refused to make findings of fact regarding the defendant's *Batson* challenges because we did not specifically order it to do so in our order. We do not think we should have to spell out the steps a trial court should take in holding a *Batson* hearing. In the interest of judicial efficiency, we will review the record of the hearing as containing an implicit ruling denying the defendant's *Batson* challenges because the prosecutor's reasons were racially neutral.

Prospective jurors Ulbricht and Carlile initially indicated they would have difficulty being impartial in this case. Mr. Ulbricht's daughter had been molested, and Ms. Carlile taught at B.J.'s school and often saw B.J. in the halls. Nevertheless, Mr. Ulbricht emphatically stated that his experience would not affect his ability to be fair and impartial. Although Ms. Carlile originally stated she might be more sympathetic to B.J.'s testimony, upon further questioning she stated that she could put her personal knowledge of B.J. aside and base her decision solely on the evidence.

Prospective jurors Sharp and Clark indicated they would have difficulty considering the minimum punishment if Marx were found guilty. Upon further questioning, Mr. Sharp stated that under the proper circumstances he could consider the minimum punishment. Ms. Clark also stated that, "if the evidence showed me there was a reason," she could consider the minimum.

Mr. McGuire originally stated he presumed Marx guilty, but upon further voir dire stated he would base his decision solely on the evidence adduced at trial. Mr. Goble was acquainted with Marx and thought he had questionable character. However, Mr. Goble explicitly stated that he could keep his opinion of Marx's character completely separate and was not biased against him.

The voir dire examination of each of these prospective jurors, taken as a whole, indicates that none of them was biased against the defendant or the applicable law. Each testified he or she would be able to consider the evidence impartially in reaching a verdict. We hold that the trial court did not err in denying Marx's challenges for cause in each instance. We overrule point of error three.

### Confession

In his fourth point of error, Marx contends the trial court erred in not suppressing his confession because (1) it does not show on its face that Marx was given and waived his *Miranda* warnings, as statutorily required, *see* Tex.Code Crim. Proc. Ann. art. 38.22, § 2 (West 1979), and (2) it was taken while he was in custody pursuant to an illegal arrest warrant. *See* U.S. Const. amend. IV, XIV.

### 1. *Compliance with Article 38.22*

Article 38.22, section 2, requires the mandatory warnings to be reflected *on the face of* any statement used against an accused in a criminal proceeding. Tex.Code Crim. Proc. Ann. art. 38.22, § 2 (West 1979). Marx's confession consists of a form entitled "Voluntary Statement" and two computer-printed pages containing the text of the confession. The form lists the warnings required by article 38.22 and states that the signer has been informed of and voluntarily waived those rights prior to giving the statement. The form then reserves space for a handwritten statement. However, because Marx could neither read nor write, his verbal statement was transcribed and attached to the form. Marx contends that because the admonishments appear on the form but not on the computer-printed pages, the statement does not comply with article 38.22.

The State responds that Marx waived error by not objecting at trial to the statement's noncompliance with article 38.22. After the jury was sworn but outside its presence, the trial court held a suppression hearing. Defense counsel objected when the State offered State's Exhibits 1 and 1–A, unedited and edited versions, respectively, of Marx's confession. Defense counsel objected to "the voluntariness and the validity" of the confession, and renewed this objection later at trial when the State offered Exhibit 1–A. The trial court overruled the objections. Defense counsel's objections to voluntariness properly preserved error on whether the statement facially showed the required admonishments.

In *Garcia v. State*, 919 S.W.2d 370 (Tex. Crim.App.1994) (opinion on rehearing), the court of criminal appeals sought to determine whether the defendant's written statement complied with the legislative intent expressed in article 38.22 by asking whether the defendant knowingly, intelligently, and voluntarily waived the rights listed in the statute. *Id.* at 386. Here the trial court found that Officer Hopkins had advised Marx of his constitutional rights, which Marx had acknowledged and waived by signing the form. The trial

court concluded that because the form referred to the computer-drafted statement, the admonishments constituted a part of the statement. Finally, the trial court found that Marx gave his confession freely and voluntarily, without requesting an attorney or termination of the interview.

■■■■■ We review a trial court's rulings at a suppression hearing for an abuse of discretion. The trial court is the sole trier of fact and judge of the credibility of witnesses and the weight to be given their testimony. *Romero v. State,* 800 S.W.2d 539, 543 (Tex. Crim.App.1990). The trial court may accept or reject any or all of a witness's testimony or evidence offered. *Alvarado v. State,* 853 S.W.2d 17, 23 (Tex.Crim.App.1993). In reviewing the trial court's decision, an appellate court does not engage in its own factual review; it determines only whether the record supports the trial court's finding. *Romero,* 800 S.W.2d at 543.

■■■■■ Marx admitted to signing the form both below the printed admonishments and below the notation that the statement was taken on the computer. In addition, the first two paragraphs of the transcribed statement state that Marx gave the statement "voluntarily of his own free will and without any promises or offers of leniency or favors, and without compulsion or persuasion by any person or persons whomever." The last paragraph, which appears alone on the next page, states, "I can not read but this statement consisting of three page(s) was read to me. Each page bears my signature, and I do affirm that all facts and statements contained herein are true and correct."[8]

At the hearing, Hopkins testified that he gave Marx the required warnings before Marx gave his statement and that Marx said he understood his rights. Hopkins wrote on the form that the statement would be taken by computer, and both he and Marx signed the form. As Marx answered Hopkins' questions regarding the girls, Officer Moody typed the confession into the computer. After the interrogation ended, Officer Moody read each line off the computer to Marx and asked if he wanted to change or add anything; Marx did not. Hopkins handed the printed statement to Marx, but Marx gave it back, saying he could not read.[9] Hopkins then read the statement to Marx, who afterward signed all three pages.

Marx testified that he only agreed to give a statement after a deputy told him that Hopkins was planning to arrest Marx's wife, Denise Wolverton. Marx said he "felt threatened" by this information and so he told the deputy he would give Hopkins whatever he wanted to prevent his wife from being arrested. Marx also testified that he did not remember the two computer printouts being part of his statement. He recognized his signature on the form and thought it "seem[ed] to be" his signature on the computer-printed pages. Marx claimed the computer-generated pages were not his statement, that he merely repeated what Hopkins told him to say. Marx denied that the statement was read back to him.

The trial court was entitled to believe the officer's testimony that he read the statement to Marx, who voluntarily waived his rights by signing the statement. Marx's signature appears twice on the "Voluntary Statement" form and on each page of the confession. Both documents state that he waived the rights set out in article 38.22. This is sufficient evidence of compliance with article 38.22. *See Garcia,* 919 S.W.2d at 386; *Cannon v. State,* 691 S.W.2d 664, 674 (Tex. Crim.App.1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986); *Raetzsch v. State,* 745 S.W.2d 520, 524 (Tex. App.—Corpus Christi 1988, pet. ref'd). We conclude that the record supports the trial court's findings that Marx was properly admonished and voluntarily gave the statement.

2. *Arrest Warrant*

Marx also contends his confession should have been suppressed because it was taken

---

8. Two copies of the statement were introduced into evidence, the only difference being that "I have read this statement ..." was changed to "I can not read but this statement ... was read to me."

9. On cross-examination, the prosecutor introduced a six-page handwritten letter, which Marx admitted to having written to his wife. Marx then stated he could not read or write "very good."

while he was in custody pursuant to an illegal arrest warrant. Officer Hopkins' handwritten affidavit in support of the warrant stated:

VIDEO RECORDED STATEMENT OF VICTIM BURNET DOE 11–94 [10]

CORROBORATING STATEMENT OF WITNESS WRITTEN

FIRST CRY STATEMENT GIVEN TO THIS OFFICER IN PERSON

SUSPECT HAD ACCESS TO VICTIM AT THE TIME VICTIM WAS SEXUALLY ASSAULTED

Officer Hopkins also prepared a second affidavit and obtained a second arrest warrant concerning the sexual assault by Marx.[11] Marx contends that the affidavits alleged insufficient facts to support issuance of the arrest warrants.

■■■■ An affidavit supporting the issuance of an arrest warrant must contain more than merely conclusory statements by the officer. *Gordon v. State*, 801 S.W.2d 899, 913 (Tex.Crim.App.1990). It must contain sufficient facts supporting the officer's personal knowledge or belief of the alleged facts such that a neutral and detached magistrate may determine whether probable cause exists. *Id.* at 914. A written statement that is the product of an illegal arrest is inadmissible as evidence against the accused. *Green v. State*, 615 S.W.2d 700, 708 (Tex.Crim.App.), *cert. denied*, 454 U.S. 952, 102 S.Ct. 490, 70 L.Ed.2d 258 (1981).

■■■ Although the affidavits use fragmented statements to communicate the officer's knowledge, they state more than mere conclusions. Each affidavit alleges that Hopkins had viewed a video-recorded statement of the victim, had personally heard an outcry from the victim and had taken a corroborating statement from a witness who allegedly witnessed the offense. The officer had also verified that Marx had access to the victim at

the time of the allegations. The affidavits provided the magistrate with enough information to determine that probable cause existed to arrest Marx. Because the arrest was not illegal, the trial court properly refused to suppress the confession on that ground. We overrule point of error four.

### Evidence of Extraneous Offenses

■■■ In point of error five, Marx complains the trial court erred in admitting the edited copy of his confession because it contained phrases that constituted inadmissible character evidence under Texas Rule of Criminal Evidence 404(b). Specifically, the edited version of the confession admitted in evidence contains the statements, "I ejaculated *every time* I did something," and "I knew *these girls* were children when I did it." Marx contends the italicized words in particular convey to a jury evidence of assaults against children other than the victim. He also claims the prejudicial effect of these statements outweighs their probative value. *See* Tex.R.Crim. Evid. 403.

■■■ Evidence of extraneous acts is admissible if it has relevance beyond its tendency to prove character and if its probative value substantially outweighs the danger of unfair prejudice. *See* Tex.R.Crim. Evid. 404(b); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App.1990). The admission of extraneous offense evidence lies within the sound discretion of the trial court and will be reversed only for an abuse of that discretion. *Ransom v. State*, 920 S.W.2d 288, 300 (Tex.Crim.App.), *cert. denied*, —— U.S. ——, 117 S.Ct. 587, 136 L.Ed.2d 516 (1996); *Montgomery*, 810 S.W.2d at 391; *Zuliani v. State*, 903 S.W.2d 812, 826 (Tex. App.—Austin 1995, pet. ref'd).

The complained-of statements are probative of the appellant's motive and knowledge in committing the offense charged—showing

---

**10.** Officer Hopkins testified that court officials in Burnet County customarily use pseudonyms for victims of sexual assault cases. "Burnet Doe 11–94" was the pseudonym given to the complainant.

**11.** "Burnet Doe 10–94" referred to another alleged sexual assault victim of Marx. The second affidavit was nearly identical:

VIDEO RECORDED STATEMENT OF VICTIM

FIRST CRY STATEMENT OF WITNESS

CORROBORATING STATEMENT OF A SECOND VICTIM WHO WITNESSED THE OFFENSE

SUSPECT HAD ACCESS TO VICTIM

VICTIM'S SIGNS OF SEXUAL ABUSE

the motive of sexual gratification and knowledge that B.J. was only a child. Therefore, they were admissible for these purposes. *See* Tex.R.Crim. Evid. 404(b); *McDonald v. State*, 513 S.W.2d 44, 51 (Tex.Crim.App. 1974); *Cummings v. State*, 651 S.W.2d 14, 17–18 (Tex.App.—Amarillo 1983, no pet.). Moreover, it is not clear that the statements refer to acts other than the three counts of sexual assault alleged in the indictment. The reference to "these girls" could have referred to the presence of the victim and the testifying witness; it does not necessarily imply that the defendant assaulted anyone other than the victim. We hold the trial court did not abuse its discretion in admitting these statements as part of the redacted confession. We overrule point of error five.

## Past Sexual Conduct

In his sixth point of error, Marx contends the trial court erred by excluding evidence of B.J.'s past sexual conduct. Marx contends this evidence was relevant because it would have provided the jury with another explanation for B.J.'s broken hymen. Dr. Sandra Thomas conducted a medical examination of B.J. on August 31, 1994, two months after the assault. On cross-examination, Dr. Thomas testified that she could not tell how long before the examination B.J. had been penetrated—it could have been two weeks or two years.

During B.J.'s testimony, defense counsel attempted to elicit testimony that B.J. had been sexually abused by an uncle prior to this offense. The trial court sustained the State's objection to the evidence as being irrelevant and immaterial. *See* Tex.R.Crim. Evid. 401, 412. Defense counsel requested and made a bill of exception, during which B.J. testified that her uncle had "put his thing in" her sometime before the incident with Marx. The trial court again denied Marx's request to introduce the evidence concerning the uncle in front of the jury.

Texas Rule of Criminal Evidence 412 governs the admissibility of evidence of previous sexual conduct. Specific instances of a victim's past sexual conduct are admissible only if three conditions are met: (1) the evidence falls within one of the limited exceptions in Rule 412(b)(2); (2) the defendant informs the

court outside the jury's presence prior to introducing the evidence *or asking any such question* of his intent to do so; *and* (3) the trial court finds that the probative value of the evidence outweighs the danger of unfair prejudice. Tex.R.Crim. Evid. 412 (emphasis added). We review the trial court's decision to admit or exclude the evidence under an abuse of discretion standard. *Wofford v. State*, 903 S.W.2d 796, 799 (Tex.App.—Dallas 1995, pet. ref'd).

■ First, appellant did not inform the court of his intention to inquire into the incident concerning the uncle prior to asking the witness about it. Instead, appellant attempted to ask about the incident on cross-examination in front of the jury, whereupon the State objected. Because Marx did not meet Rule 412's procedural requirement for introducing this evidence, he cannot now complain of its exclusion. *See Golden v. State*, 762 S.W.2d 630, 632 (Tex.App.—Texarkana 1988, pet. ref'd).

■ Moreover, even assuming Marx had informed the court of his intent to inquire into the incident, we hold the trial court did not abuse its discretion in excluding the evidence. Marx argues the evidence was "necessary to rebut or explain scientific or medical evidence offered by the state." *See* Tex. R.Crim. Evid. 412(b)(2)(A). The State introduced Dr. Thomas's testimony to show that the thirteen-year-old B.J. had been sexually assaulted. Dr. Thomas testified that she could not tell *when* B.J. had been penetrated; thus her medical testimony did not tend to corroborate B.J.'s identification of Marx as the assailant. Therefore, the excluded evidence was not *necessary* to explain or rebut the State's evidence; the fact that B.J. may have been assaulted some other time was immaterial. Furthermore, we gather from the record that the trial judge felt that the unfair prejudice suffered by B.J. if forced to testify concerning the prior incident outweighed the probative value of the testimony. We agree the testimony did not meet the balancing test. *See* Tex.R.Crim. Evid. 412(b)(3); *Allen*, 700 S.W.2d at 930. We overrule the sixth point of error.

### Witness Testimony

Marx's seventh point of error complains that the trial court erroneously allowed witnesses to testify who were not on the State's witness list and were present in the courtroom during the trial even though the rule had been invoked. *See* Tex.Code Crim. Proc. Ann. art. 36.05 (West 1981); Tex.R.Crim. Evid. 613. During the guilt-innocence phase of trial, the State called one rebuttal witness; during the punishment phase, it called three other witnesses not on its witness list.

We review a trial court's allowing the testimony of witnesses that were not on the State's witness list for an abuse of discretion. *Hightower v. State*, 629 S.W.2d 920, 925 (Tex.Crim.App.1981). In determining whether the trial court abused its discretion, we consider whether the prosecutor engaged in bad faith by not disclosing the witness's name, and whether the defendant could reasonably anticipate that the witness would testify although his or her name was not on the list. *Id.; Clay v. State*, 505 S.W.2d 882, 885 (Tex.Crim.App.1974). Absent a showing of bad faith, a trial court does not abuse its discretion by allowing the State to call a witness for the sole purpose of rebutting unforeseen testimony. *Hightower*, 629 S.W.2d at 925; *Doyle v. State*, 875 S.W.2d 21, 22 (Tex.App.—Tyler 1994, no pet.).

The State called Darrell Wolverton as a rebuttal witness. In response to defense counsel's objection, the prosecutor stated that he did not anticipate calling Wolverton until that day. Wolverton testified on the existence and condition of the doorlock to the trailer in which the offense occurred. B.J. had testified that Marx locked the door with a slide-lock from the inside during the commission of the offense; defense counsel had introduced impeachment evidence that there was no way to lock the door from the inside. On rebuttal, Wolverton testified that the inside of the door had a chain-lock with a groove which the chain slid into. The State was entitled to call Wolverton to rebut the defense's impeachment evidence.

At the punishment phase, the State called Vicki Sealy, Wanda Smith, and Sandra Wolverton. Vicki Sealy testified she had known appellant for nine or ten years. Wanda Smith testified she had known appellant for eight years. Both Sealy and Smith are related to Marx's niece J.M. Sandra Wolverton was apparently related to Marx's wife, Denise Wolverton; she testified she had known appellant for nine years. All three women, when asked whether Marx's reputation in the community for being a peaceful and law-abiding citizen was good or bad, answered that it was bad. Although these three witnesses were not on the State's list, Marx could have reasonably anticipated that these three women who were related to him and had known him for years would testify concerning his reputation. There were no allegations of bad faith on the part of the prosecution in failing to disclose these witnesses. We hold the trial court did not abuse its discretion in allowing them to testify.

Marx also contends these witnesses' testimony was taken in violation of the rule allowing the trial court to require witnesses to remain outside the courtroom during the testimony of other witnesses. *See* Tex.R.Crim. Evid. 613. Enforcement of the rule lies within the sound discretion of the trial court; its actions will be disturbed only upon a showing of an abuse of discretion. *Cooks v. State*, 844 S.W.2d 697, 733 (Tex. Crim.App.1992), *cert. denied*, 509 U.S. 927, 113 S.Ct. 3048, 125 L.Ed.2d 732 (1993). In determining whether the trial court abused its discretion, we must consider: (1) whether the witness actually heard the testimony or conferred with another witness without court permission; and (2) whether the witness's testimony contradicted the testimony of a witness he actually heard from the opposing side or corroborated the testimony of a witness he actually heard from the same side on an issue of fact bearing upon the issue of guilt or innocence. *Id.; Guerra v. State*, 771 S.W.2d 453, 476 (Tex.Crim.App.1988). The admission of testimony of a witness having no personal knowledge of the offense is not an abuse of discretion. *Guerra*, 771 S.W.2d at 476.

When defense counsel objected to Darrell Wolverton's presence in the courtroom earlier in the trial, the prosecutor told

the court that Wolverton was removed from the courtroom as soon as the State became aware he would be called to testify. Wolverton's testimony was limited to the issue of the existence and condition of the doorlock in an attempt to cure the impeachment evidence introduced by the defense and did not bear on the defendant's guilt or innocence. The trial court did not abuse its discretion in admitting the testimony of Darrell Wolverton.

■ Each of the three complained-of witnesses called during the punishment phase gave only opinions as to Marx's reputation in the community. Because such testimony was not relevant to Marx's guilt or innocence, its admission was not an abuse of discretion. We overrule the seventh point of error.

## CONCLUSION

Testimony by closed-circuit television does not violate a criminal defendant's right to due process of law when the trial court finds the procedure to be necessary to the well-being of the child. The trial court should instruct the jury that the televised testimony shall not be taken as a comment on the defendant's guilt. In this case, where the requisite finding of necessity was supported by the record, and the defendant did not request a special instruction but the trial court instructed the jury that Texas statutes authorize testimony by closed-circuit television, the alternative form of testimony did not violate the defendant's right to be presumed innocent. We find the appellant's other points of error to be without merit and, accordingly, affirm the conviction.

KIDD, Justice, concurring.

This appeal requires a balancing of two powerful and competing interests: society's legitimate concern for the welfare and protection of child witnesses versus the constitutional rights of the accused to confront his accusers and to be presumed innocent until proven guilty. Upon the State's motion, the trial court permitted the thirteen-year-old complainant and a six-year-old witness[1] to testify outside the presence of the appellant

by way of closed-circuit television. Relying largely on the strength of *Gonzales v. State*, 818 S.W.2d 756 (Tex.Crim.App.1991), the majority affirms. I choose to write separately to express my concerns regarding the majority opinion, which I believe broadens the reach of *Gonzales* and ensures that, for child witnesses, testimony by closed-circuit television will become the rule rather than the exception. By way of specific example, I would hold that the trial court erred in permitting the nonvictim child witness to testify outside the presence of the appellant and the jury.

The trial court held a pretrial hearing and heard testimony to determine whether the nonvictim witness should be allowed to testify by closed-circuit television. To place the pretrial-hearing testimony in context, it is necessary to briefly review the case law in this area. In *Coy v. Iowa*, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), the United States Supreme Court held that the Confrontation Clause of the Sixth Amendment provides the accused the right to *confront* face-to-face at trial the witnesses who testify against him. The Supreme Court held that confrontation was a *core guarantee* that ensures a fair trial and preserves the integrity of the fact-finding process in its search for the truth.

Justice Scalia, speaking for the Court, put it this way:

The State can hardly gainsay the profound effect upon a witness of standing in the presence of the person the witness accuses, since that is the very phenomenon it relies upon to establish the potential "trauma" that allegedly justified the extraordinary procedure in the present case. That face-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or reveal the child coached by a malevolent adult. It is a truism that constitutional protections have costs.

*Id.* at 1020, 108 S.Ct. at 2802.

The Court held that the placement of a screen, authorized by the Iowa statute, be-

---

[1] In a separate cause, the appellant was accused of aggravated sexual assault of this witness. However, this child's testimony at trial did not involve any of the facts of that alleged criminal episode, but rather some alleged eyewitness testimony regarding the incident on trial.

tween the defendant and the child sexual assault victims during their testimony at trial violated the Confrontation Clause of the Sixth Amendment. Justice O'Connor, joined by Justice White, concurred in a separate opinion. She agreed that the Confrontation Clause was violated in the *Coy* case, but noted her view that the rights involved were not absolute and might be subject to exceptions.

Two years later, Justice O'Connor writing for the Court found such an exception in the case of *Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). In *Craig,* the Court upheld a Maryland statute which permitted the fact-finder to receive, by closed-circuit television, the testimony of a child witness alleged to be the victim of child abuse, *if* the trial judge first determined that the testimony of the child victim in open court and in the presence of the defendant would result in the child suffering *serious* emotional distress to the extent that the child *could not reasonably communicate.*

*Coy* and *Craig,* then, set the stage for the Court of Criminal Appeals decision in *Gonzales v. State,* 818 S.W.2d 756 (Tex.Crim.App. 1991). In *Gonzales* the court permitted a nonvictim child eyewitness in a murder case to testify by closed-circuit television. However, the court specifically recognized that the trial judge was required to hear evidence and make the following specific findings in order to deviate from normal courtroom procedure:

> First, [that] use of the one-way closed-circuit procedure is necessary to protect the welfare of the particular child witness who seeks to testify. Second, the trial court must also find that the child witness would be traumatized, not only by the courtroom generally, but by the presence of the defendant. Third ..., the trial court must determine that the emotional distress suffered by the child witness in the presence of the defendant is more than de minimis, i.e., more than mere nervousness or excitement or some reluctance to testify.

*Gonzales,* 818 S.W.2d at 762. *See also Hightower v. State,* 822 S.W.2d 48, 51 (Tex.Crim. App.1991).

Applying *Gonzales* to the testimony presented at the pretrial hearing in this cause, the majority concludes that the trial court did not err in permitting the nonvictim child witness to testify by closed-circuit television. I disagree.

At the pretrial hearing, the State called two witnesses—the child's natural mother and an expert witness with a license in professional counseling who had experience with child victims in sexual assault cases.

On direct examination the mother testified that her daughter had shown fear toward appellant but stated regarding whether her daughter could testify in open court that she was "ready for it" and "said she wanted to come." On cross examination, when defense counsel explained to the mother that the child would not be testifying regarding the facts of her own complaint but merely as an eyewitness to some facts regarding the incident on trial, the mother unequivocally testified "well, that she's okay with. I mean, she's ready for that."

The expert witness was even more emphatic regarding the child's ability to give testimony in open court. In response to the prosecution's questions the expert stated as follows:

Q. Okay. Doctor, do you feel like if she testifies in open court in the presence of Jeffery Steven Marx, that she will—the result would cause further serious emotional and physical distress than what she has now?

A. If no one was ugly to her, you know, made her feel really badly about it—I think Jennifer is more of a talker than most. She will probably come on and do it.

Q. Of course, we can make her do that as you well know, but my concern is what would be the emotional and physical distress that would cause—that would be resulting from her testifying in open court in the presence of another.

A. In the presence of Jeffrey?

Q. Yes, ma'am.

A. She tells me she wants to. So unless she gets more frightened than I ex-

pect, that little girl would probably testify okay.

Even under direct questioning from the trial judge the expert opined that the child witness was "a very strong little girl . . . who wants to tell her story." Finally, the trial court asked the expert the ultimate question:

> THE COURT: Do you think that there would be any emotional or physical problems with her confronting—testifying from that witness stand and having to confront [appellant]?
>
> THE WITNESS: Your Honor, I couldn't say for sure that there would not be. *I wouldn't expect it.*

(Emphasis added.)

In my opinion, even after according due deference to the trial court, this testimony does not come close to meeting the *Gonzales* standards.

In addition, I am concerned about the presumption of innocence implications of the trial court's action. Anytime a trial court deviates from normal courtroom procedure, it runs the risk that the jury will place the spotlight of blame upon the accused. If the presumption is that the appellant is innocent, a jury cannot help but wonder why the child witnesses are testifying outside the courtroom, closeted away from the ostensibly innocent defendant. Instructions to the jury are notoriously ineffective to prevent prejudice in this type of situation.

Additionally, while I am mindful that, as an intermediate appellate court, we are bound to follow *Gonzales,* I cannot help but observe the consequences of the *Gonzales* decision. The United States Supreme Court in *Craig* permitted a confrontational exception based upon a Maryland statute that set out particularized facts which invoked the statute as well as specific procedures to be followed thereafter. Likewise, Texas has such a statute to be followed in a specific class of cases. *See* Tex.Code Crim. Proc. Ann. art. 38.071 (West Supp.1997). The problem in *Gonzales,* which is also present here, is that the statute is inoperative because the child witnesses do not come within the purview of the legislative enactment. In *Gonzales,* the criminal offense was murder while the statute is limited to sex crimes involving children. In the instant cause, while the criminal offense fits the statute, the child witnesses do not. The complainant is thirteen years old while the statute is limited to those twelve and under. And, the six-year-old child witness is not the victim of the criminal offense as required by the statute but rather is a complainant in an extraneous criminal offense.

Faced with the inability to utilize the statute as evidence of Texas legislative policy, the court of criminal appeals in *Gonzales* allowed trial judges on a case-by-case basis to provide the compelling state interest sufficient to override a defendant's constitutional right to confront witnesses. This permits, in my opinion, the exception to swallow the rule. The district courts of this state are allowed to make these decisions on an *ad hoc* basis subject to appellate review only under an abuse of discretion standard. The *Gonzales* test appears to me to create the specter of nonuniform and inconsistent public policy depending on the geographic area of the state and the particular trial judge involved in the case. This phenomenon is particularly troubling in the sensitive area of a defendant's right to a fair trial with all its constitutional due process implications.

For all of the foregoing reasons, I conclude that the trial court erred when it permitted the nonvictim child witness to testify outside the presence of the appellant and the jury. However, I concur in the result reached by the majority because I regard the error as harmless beyond a reasonable doubt. Tex. R.App. P. 81(b)(2).

Evidence against the appellant consisted of his voluntary confession, the testimony of the complainant, and testimony of other corroborative witnesses including that of the six-year-old child witness in question. In his confession, the appellant voluntarily admits engaging in sexual intercourse with the complainant which forms the basis for the jury's verdict of guilt. A review of the child witness's testimony reveals that she testified to having observed, through the window, the appellant and the complainant engaging in sex. The child's testimony, though brief, is filled with contradictions and overly detailed

descriptions of other persons present who witnessed the same sexual conduct who were either unavailable to the prosecution or would not verify the child's story.

In sum, it is open to question whether the testimony of this child witness helped or hurt the prosecution. At best, it provided minimal corroboration of criminal conduct to which the appellant had already confessed. At worst, it provided the defense with considerable ammunition to challenge the prosecution's case. Therefore, I conclude that, although the trial court erred in permitting the nonvictim witness to testify by closed-circuit television, it played no part in the appellant's conviction.

In conclusion, these cases always present compelling and egregious fact situations. No judge can be unsympathetic to cases involving sexual abuse of child victims. However, I believe we must resist the temptation to bend immutable constitutional principles in order to protect society's young. I fear the majority has pushed this delicate balance too far in that direction.