TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN









NO. 03-04-00359-CR






Bruce Gordon Hatter, Appellant



v.



The State of Texas, Appellee







FROM THE DISTRICT COURT OF LLANO COUNTY, 33RD JUDICIAL DISTRICT

NO. CR5425, HONORABLE LLOYD DOUGLAS SHAVER, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N



 A jury found appellant, Bruce Gordon Hatter, guilty of the offenses of injury to a
child, aggravated sexual assault of a child, sexual assault of a child, and indecency with a child. See
Tex. Pen. Code Ann. §§ 22.04 (injury to a child), 22.021(a)(1)(B) (aggravated sexual assault of a
child), 22.011(a)(2) (sexual assault of a child), 21.11 (indecency with a child) (West 2003 & Supp.
2005). Hatter asserts that the district court erred in admitting expert testimony regarding sadism and
in not allowing Hatter's counsel to ask two of the victims certain questions during cross-examination
concerning prior criminal charges and previous sexual conduct. We will affirm the judgment of the
district court.


BACKGROUND

 The jury heard evidence that on the morning of August 21, 2003, three teenagers
(referred to throughout trial as A, B, and C) walked over to Hatter's house. It is unclear from the
record how the teenagers knew Hatter, a 48-year-old man, although there is some evidence that
Hatter had a relationship with C's mother. A and C were 14-year-old boys and B was a 15-year-old
girl. The three teenagers testified that they were good friends with each other, and C testified that
Hatter had offered to give them a ride to school that day. 

 The teenagers testified that once they arrived at Hatter's house, they noticed that
Hatter had been drinking alcohol. According to the teenagers, Hatter invited them inside, and soon
they were drinking alcohol with him. The teenagers testified that they became intoxicated.

 C testified that while he and A were in the living room watching television, Hatter
and B went into the bedroom. C testified that he looked into the bedroom and saw Hatter having
"oral sex" with B, who was "just lying there," "had all of her clothes off," and didn't "seem like she
was happy." C then testified that, after Hatter had sex with B, Hatter told A and C to have sex with
B. A and C both testified that they did but that they didn't want to. 

 C testified that after he and A had sex with B, Hatter put handcuffs on A and C. C
also testified that Hatter put a "clothespin on [A's] genitalia" and on "his stomach and stuff" as well
as "nipple clamps with a chain attached to it." C further testified that Hatter "grabbed [A's] penis
and pinched it." C also testified that Hatter tried to put clamps and clothespins on him, but that C
prevented him from doing so by "kicking in the air to try and hit his hands." On cross-examination,
C testified that Hatter said "that if we told anybody about what happened that day, he would kill us."

 A testified that he saw Hatter taking B's clothes off in the bedroom and "kissing on
her and stuff." A also testified that Hatter told him to have sex with B, and that "he would knock
[A] through the wall if it didn't happen." A stated that he had sex with B, but he testified that as he
did so, it looked like B was upset, so he stopped. A also testified that later in the day, when Hatter
was "messing with" B again, A told Hatter to "back off because she was not liking it." A testified
that this made Hatter mad and that Hatter first hit him, then grabbed him and "twisted" his penis. 
A also described what happened when Hatter handcuffed him:


Q: So could you describe for us how you were handcuffed?


A: My hands were up over my head. I was sitting in the chair. I was handcuffed
to a two-by-four coming up.


Q: Was that a wall in the bedroom?


A: Yes, ma'am.


Q: And what did you have on?


A: Nothing, I believe.


. . . . 


Q: And at what point did you see these [nipple clamps]?


A: Whenever I was handcuffed.


Q: Tell us what happened.


A: They were put on me.


Q: And if you would, could you tell us where?


A: On my nipple.


Q: And did that hurt?


A: Yes, ma'am.


Q: What were you doing when that was happening?


A: I was handcuffed, and I was telling him to stop.


Q: Did he do anything with regard to your penis?


A: Yes, ma'am.


Q: Can you tell us about that?


A: He put a clothespin on my nut sack.


. . . . 


Q: At that time, was there any way that you could fight off the defendant?


A: I tried.



The jury also heard evidence that A was screaming and crying during the incident.

 The final teenager to testify was B, who had difficulty explaining what Hatter did to
her:


Q: And then what did Bruce do?


A: He touched me in certain places.


Q: Did you have any clothes on at the time?


A: No, ma'am.


Q: Who took your clothes off?


A: I don't remember.


Q: Did you take them off, or you don't know?


A: I don't know.


Q: Were you on the bed?


A: Yes, ma'am.


Q: Did Bruce have any clothes on?


A: I don't remember.



 B also testified that Hatter touched her on her breasts and inserted his finger into her
vagina. When the prosecutor asked B if Hatter did anything with his mouth, B became very
emotional and had to be excused for the day. When she resumed her testimony the next morning,
B testified that Hatter made the boys have sex with her and that she didn't want to.

 The teenagers also testified that three women arrived at the house later that day. 
Hatter's former girlfriend, Sylvia Perez, drove to Hatter's house that afternoon with her two adult
daughters, Nauna Hernandez and Jessica Gomez. Perez testified that she did not own a telephone
and needed to use Hatter's phone to call her son. Gomez testified that when they arrived at Hatter's
house, she went to the front door and knocked. No one answered, and Gomez looked in the window
and saw someone running around. Gomez testified that she became concerned and returned to her
mother's van, telling her mother and her sister that "something was going on inside the house." 
Perez and Hernandez got out of the van and approached the house together with Gomez. Gomez
testified that Hatter opened the door, wearing only shorts. The three women walked inside and sat
down on the couch. They testified that they observed A trying to get dressed; he was wearing
nothing but boxer shorts. They also testified to seeing C handcuffed to a wall in Hatter's room and
hearing B crying in the bathroom. Gomez testified that she walked to the bathroom and found B
naked, saying that "she wanted to go home and that she never wanted to do it again." Gomez walked
back into the living room and told her mom about B. A then asked Gomez to help B get dressed. 
Gomez testified that at this point Hatter became violent towards A, first throwing beer bottles at him
and then grabbing him, throwing him against the wall, and repeatedly punching him in the face. 
Gomez testified that her mother began yelling at Hatter, trying to get him to stop hitting A, which
he eventually did. Gomez then asked Hatter to unlock C from his handcuffs, and Hatter attempted
to do so, but he was shaking so badly that Gomez had to take the key away from him and unlock the
handcuffs herself. After helping B get partially dressed, the women led the teenagers out of Hatter's
house. Gomez testified that as B walked past Hatter, he said something to her that caused B to begin
crying again. The women and the teenagers got in the van and drove to C's house. Perez testified
that she then called the police.

 Hatter was charged with four counts of injury to a child, two counts of aggravated
sexual assault of a child, two counts of sexual assault of a child, and two counts of indecency with
a child. The jury found Hatter guilty of three counts of injury to a child, one count of aggravated
sexual assault of a child, two counts of sexual assault of a child, and one count of indecency with
a child. The court assessed punishment at twenty-three years' confinement. This appeal followed.


DISCUSSION

Admission of expert testimony 

 In his first issue on appeal, Hatter asserts that the district court erred in allowing the
State to present expert testimony on the issue of sadism. Hatter asserts that sadism was not relevant
to the State's case because it was not an element of any of the offenses alleged and that, even if it
was relevant, the prejudicial nature of the testimony outweighed any probative value. See Tex. R.
Evid. 403. 

 During the guilt-innocence phase of trial, the State called Dr. Matthew Ferrera to
testify about the effect of sexual sadism on child victims and their ability to report offenders. Ferrera
did not have any personal knowledge of the facts of the case. He did, however, review the police
report.

 Ferrera is a licensed psychologist specializing in the study of sexual abuse in general
and sexual sadists in particular. Ferrera has either assessed or treated at least thirty-three sexual
sadists over the course of his career. During trial, Hatter did not dispute the qualifications of Ferrera
or the reliability of his testimony. Hatter only objected to the relevance of his testimony about
sadism. 

 To admit expert testimony, the trial court must find that the evidence satisfies both
Rule 702, that the testimony will be helpful to the trier of fact, and Rule 403, that the testimony's
probative value is not outweighed by any prejudicial effect. Tex. R. Evid. 403, 702; Jordan v. State,
928 S.W.2d 550, 554 (Tex. Crim. App. 1996); Kelly v. State, 824 S.W.2d 568, 572 (Tex. Crim. App.
1992). We review the trial court's decision to admit expert testimony for an abuse of discretion. 
Carrasco v. State, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005). The appellate court must uphold
the trial court's ruling if it is reasonably supported by the record and is correct under any theory of
law applicable to the case. Id. The appellate court reviews the ruling of the trial court in light of
what was before it at the time the ruling was made. Id.

 Rule 702 states that if the expert's "specialized knowledge will assist the trier of fact
to understand the evidence or to determine a fact in issue," then the expert "may testify thereto in
the form of an opinion or otherwise." Tex. R. Evid. 702. An expert's testimony can be helpful to
the trier of fact even when the expert does not have personal knowledge of the relevant facts. 
Matson v. State, 819 S.W.2d 839, 853 (Tex. Crim. App. 1991).

 However, an expert witness's testimony must aid the jury and not supplant its
determination. Tex. R. Evid. 704; Schutz v. State, 957 S.W.2d 52, 59 (Tex. Crim. App. 1997). 
Expert witness testimony concerning child sexual abuse does not aid the jury when it constitutes a
direct opinion on the child victim's truthfulness and in essence, decides an ultimate fact issue for the
jury. Yount v. State, 872 S.W.2d 706, 708 (Tex. Crim. App. 1993). Expert witness testimony should
only be admitted when it is helpful to the jury and limited to situations in which the expert's
knowledge and experience on a relevant issue are beyond that of an average juror. Williams v. State,
895 S.W.2d 363, 366 (Tex. Crim. App. 1994); Yount, 872 S.W.2d at 710-11 (citing Duckett v. State,
797 S.W.2d 906, 914 (Tex. Crim. App. 1990)). 

 Expert witness testimony that a child victim exhibits elements or characteristics that
have been empirically shown to be common among sexually abused children is relevant and
admissible under Rule 702 because it is specialized knowledge that is helpful to the jury. Perez v.
State, 113 S.W.3d 819, 832 (Tex. App.--Austin 2003, pet. ref'd); Hitt v. State, 53 S.W.3d 697, 707
(Tex. App.--Austin 2001, pet. ref'd); Gonzales v. State, 4 S.W.3d 406, 417 (Tex. App.--Waco
1999, no pet.); Vasquez v. State, 975 S.W.2d 415, 417 (Tex. App.--Austin 1998, no pet.); Decker
v. State, 894 S.W.2d 475, 479 (Tex. App.--Austin 1995, pet. ref'd). As long as the expert does not
give a direct opinion about the truthfulness of a particular complainant, such testimony is not
impermissible "bolstering." See Cohn v. State, 849 S.W.2d 817, 819 (Tex. Crim. App. 1993);
Mumphrey v. State, 155 S.W.3d 651, 656 (Tex. App.--Texarkana 2005, pet. ref'd). (1) Such testimony
can assist the trier of fact in determining how child victims of abuse typically behave:


The rationale is that while the common experience of jurors enables them to assess
the credibility of alleged assault victims generally, the unique pressures surrounding
a child victim, and their concomitant effects on the child's behavior, are such that an
expert's testimony is deemed useful in assisting the jurors' assessment of the child's
credibility. The expert's testimony about the general behavioral traits of child
victims--e.g., delay in reporting the incident, recantation, truancy, embarrassment,
running away from home, and inconsistent versions of abuse--explains to the jurors
that such behavior, which might otherwise be attributed to inaccuracy or falsification,
is typical of the class of victims and does not necessarily indicate a lack of credibility.
Thus, such testimony, which allows the jury to assess the credibility of a particular
complainant more fairly by explaining the emotional antecedents underlying the
typical victim's behavior, meets the requirements of Rule 702.


Kirkpatrick v. State, 747 S.W.2d 833, 836 (Tex. App.--Dallas 1987, pet. ref'd).

 In this case, the jury heard evidence that the teenagers were subjected to sadistic
physical and sexual abuse. Ferrera testified to how sadistic abuse affects the ability of child victims
to testify against their abusers:


Q: Now, with regard to victims that have gone through this sexual sadism
experience, what about that effect, if any--what effect, if any, would that have
on them being able to testify in front of the predator?


A: That would be very difficult to do. One of the effects of all sexual abuse, and
in particular sexual sadism, is something called "powerlessness," where the
individual truly feels that they have no power. To be in the presence of the
perpetrator, especially if the perpetrator is a sadist, can make the person freeze
up, can make the person non-responsive. In extreme cases, it can cause them to
break down and try to escape. If--this chair, for example, if a victim was sitting
in this chair, they might want to bolt, run, get out of this whole courtroom.


. . . . 


Q: Now, would it surprise you or would you expect that children that were
testifying in front of a sexual sadist, would they typically respond with they
didn't remember rather than telling the events of what happened in front of that
same predator?


A: I would assume that they would say "don't know," look the other way, try not
to give a whole lot of information.


 This testimony assisted the jury in understanding the behavior of child victims of
sexual sadism, and we do not believe the district court abused its discretion in admitting it. The
court could not expect the average juror to know how sadistic abuse affects children who are subject
to it. Ferrera's testimony was particularly relevant in this case because all three teenagers
occasionally would state that they "did not remember" or "did not know" what exactly went on
during the incident. For example, C testified that he did not remember how he was handcuffed, A
testified that he did not remember whether or not Hatter was wearing clothing when he saw him
having sex with B, and B testified that she did not remember whether Hatter took her clothes off or
if she took her clothes off. B was so distraught during her testimony that at one point she completely
broke down on the stand and was unable to resume her testimony until the following day. Although
there may be many reasons why a child witness may exhibit such behavior on the stand, Ferrera's
testimony gave the jurors one possible explanation for why child victims of sexual sadism would not
remember certain facts or would have difficulty testifying in front of their abuser. Ferrera's
testimony was, therefore, relevant under Rule 702.

 In the alternative, Hatter argues that the testimony was more prejudicial than
probative under Rule 403. Relevant evidence must be excluded when there is a clear disparity
between the degree of prejudice of the offered evidence and its probative value. Tex. R. Evid. 403;
Jones v. State, 944 S.W.2d 642, 653 (Tex. Crim. App. 1996).

 To violate Rule 403, it is not enough that the evidence is "prejudicial"--it must be
unfairly prejudicial. Vasquez v. State, 67 S.W.3d 229, 240 (Tex. Crim. App. 2002). Unfair prejudice
occurs when the evidence has "an undue tendency to suggest decision on an improper basis,
commonly, though not necessarily, an emotional one." Id. The trial court's ruling to admit evidence
over a Rule 403 objection is measured by an abuse-of-discretion standard. Montgomery v. State, 810
S.W.2d 372, 391 (Tex. Crim. App. 1990). The ruling is not an abuse of discretion if it was within
the "zone of reasonable disagreement." Id.

 Hatter contends that the evidence was of little probative value because sadism was 

not an element of any of the offenses alleged by the State. However, because the alleged abuse was
sadistic in nature, Ferrera's testimony shed light on such relevant issues as how the abuse may have
injured and psychologically affected the victims, how the victims may have been threatened and
placed in fear, and whether any behavior the victims engaged in with each other may have been
coerced. Because of their young age and the traumatic nature of the abuse, the teenagers themselves
were unable to explain fully what happened to them and how the incident affected them. We find
nothing in Ferrera's testimony that was unfairly prejudicial, and we conclude that the district court
did not abuse its discretion in admitting the evidence. 

 Furthermore, even assuming that the trial court abused its discretion in admitting
Ferrera's testimony, Hatter is not entitled to reversal unless he shows that the error was: (1) of
constitutional magnitude, or (2) affected a substantial right. Tex. R. App. P. 44.2(a), (b). The
erroneous admission of expert testimony is non-constitutional error. See Sexton v. State, 93 S.W.3d
96, 101 (Tex. Crim. App. 2002). Accordingly, the error must be disregarded unless Hatter's
substantial rights are affected. Tex. R. App. P. 44.2(b). Substantial rights are not affected by the
erroneous admission of evidence if the appellate court, after examining the record as a whole, has
fair assurance that the error did not influence the jury, or had but a slight effect. Motilla v. State, 78
S.W.3d 352, 355 (Tex. Crim. App. 2002); Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App.
1998). In assessing the likelihood that the jury's decision was adversely affected by the error, the
appellate court should consider everything in the record, including any testimony or physical
evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the
character of the alleged error, and how it might be considered in connection with other evidence in
the case. Motilla, 78 S.W.3d at 355. We may also consider the jury instructions, the State's theory
and any defensive theories, closing arguments, and even voir dire, if applicable. Id. at 355-56. We
may also consider whether the State emphasized the error. Id. at 356. 

 After reviewing the record, we believe any prejudicial effect the evidence may have
had on the jury was minimized by the fact that, before Ferrera's testimony, the victims had already
provided detailed testimony about the sadistic nature of the acts Hatter committed against them. 
Also, pictures of the clothespins, nipple clamps, and handcuffs that were used on the boys were
admitted into evidence. Because there was ample evidence in the record regarding the sadistic nature
of the abuse, we conclude that the admission of Ferrera's testimony did not affect Hatter's substantial
rights. We overrule Hatter's first issue. 


Questions concerning the teenagers' history

 In his second and third issues, Hatter asserts that the trial court erred in not allowing 

him to ask A and C certain questions during cross-examination. During a bench conference, Hatter
submitted to the district court the following questions addressed to both A and C:


Are you on probation for theft, shoplifting or skipping school?


Have you previously gotten into trouble for skipping school? 



In addition, Hatter submitted the following question addressed only to C: 



[Have] you previously had sex with B before August 21, 2003?

 The district court did not allow Hatter to ask these questions. Hatter argues that these
questions were admissible to attack the credibility of the male victims. The trial court has discretion
to decide the admissibility of evidence and, absent an abuse of discretion, its rulings will not be
overturned. Moses v. State, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). Thus, an appellate court
should affirm the trial court's evidentiary ruling if it was within the zone of reasonable disagreement. 
Id.


 Prior crimes

 Texas Rule of Evidence 609 permits the credibility of a witness to be attacked with
evidence of the witness's conviction for a felony or crime involving moral turpitude. Tex. R. Evid.
609(a). However, evidence of juvenile adjudications is ordinarily not admissible for impeachment
purposes. Id. 609(d). The reason for this rule is that juvenile adjudications are not convictions. Tex.
Fam. Code Ann. § 51.13(a) (West Supp. 2005). In limited circumstances, the constitutional right
to cross-examination may require a juvenile adjudication to be admitted. Foster v. State, 25 S.W.3d
792, 795 (Tex. App.--Waco 2000, pet. ref'd). For example, a pending juvenile charge may be
admissible on cross-examination to show the motive or bias of the witness to testify favorably for
the State. Carmona v. State, 698 S.W.2d 100, 102 (Tex. Crim. App. 1985); Harris v. State, 642
S.W.2d 471, 476 (Tex. Crim. App. 1982). Also, a defendant is permitted to cross-examine a crucial
witness regarding his juvenile record for the limited purpose of showing bias where the witness was
on probation for the juvenile crime while assisting the police and testifying in court. Davis v. Alaska,
415 U.S. 308 (1974). Defendants are not, however, permitted to cross-examine a witness regarding
prior juvenile adjudications for general character impeachment purposes. Foster, 25 S.W.3d at 795;
Gilmore v. State, 871 S.W.2d 848, 851 (Tex. App.--Houston [14th Dist.] 1994, no pet.). 

 Because A and C are juveniles, if they had committed theft, shoplifting, or truancy
as Hatter alleged, these offenses would have resulted in juvenile adjudications inadmissible under
Rule 609(d), not criminal convictions admissible under Rule 609(a), and Hatter has made no
showing as to why the adjudications would be relevant apart from general character impeachment
purposes. The district court did not abuse its discretion in refusing to allow Hatter to ask questions
related to those offenses. (2) 


 Previous sexual conduct

 Specific instances of a victim's past sexual conduct are admissible only if three
conditions are met: (1) the evidence falls within one of the limited exceptions in Rule 412(b)(2); (2)
the defendant informs the court outside the jury's presence prior to introducing the evidence or
asking any such question of his intent to do so; and (3) the trial court finds that the probative value
of the evidence outweighs the danger of unfair prejudice. Tex. R. Evid. 412; Marx v. State, 953
S.W.2d 321, 337 (Tex. App.--Austin 1997), aff'd, 987 S.W.2d 577 (Tex. Crim. App. 1999).

 The limited exceptions in Rule 412(b)(2) apply when the evidence:


(1) is necessary to rebut or explain scientific or medical evidence offered by the
State;


(2) is of past sexual behavior with the accused and is offered by the accused upon
the issue of whether the alleged victim consented to the sexual behavior which
is the basis of the offense charged;


(3) relates to the motive or alleged bias of the victim;


(4) is admissible under Rule 609; or


(5) is constitutionally required to be admitted.



Tex. R. Evid. 412(b)(2).


 Evidence that C previously had sex with B does not fall under any of these
exceptions. Hatter asserts, however, that evidence of a consensual sexual relationship between B
and C could relate to the motive of C to lie "so that he wouldn't get into trouble" for having sex. 
However, the proposed question asked about any sexual activity between B and C occurring prior
to the date of the incident. This question is not highly probative of whether C had a motive to lie
about sexual activity between B and C during the incident. We also note that Hatter made no
showing either during trial or in his brief that the probative value of a sexual relationship between
B and C outweighed the danger of unfair prejudice.

 The district court did not abuse its discretion in refusing to allow Hatter to ask A and
C about their prior offenses and C about his prior sexual conduct with B. We overrule Hatter's
second and third issues.


CONCLUSION Having overruled Hatter's issues on appeal, we affirm the judgment of the district
court.



 __________________________________________

 Bob Pemberton, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Affirmed

Filed: May 26, 2006

Do Not Publish
1. The Cohn court explained the difference between evidence that impermissibly "bolsters"
a witness and evidence that merely corroborates:


"Bolstering" may perhaps be understood a little more precisely to be any
evidence the sole purpose of which is to convince the fact-finder that a particular
witness or source of evidence is worthy of credit, without substantively
contributing "to make the existence of a fact that is of consequence to the
determination of the action more or less probable than it would be without the
evidence." See Rule 401, supra. Accordingly, evidence that corroborates
another witness' story or enhances inferences to be drawn from another source
of evidence, in the sense that it has an incrementally further tendency to establish
a fact of consequence, should not be considered "bolstering."


Cohn v. State, 849 S.W.2d 817, 819-20 (Tex. Crim. App. 1993). 


 Ferrera did not offer his opinion about the credibility or truthfulness of the complainants;
therefore, his testimony cannot be considered "bolstering." 
2. In addition, we note that, even if the offenses had resulted in criminal convictions, the party
seeking to introduce evidence pursuant to Rule 609 has the burden of demonstrating that the
probative value of a conviction outweighs its prejudicial effect. Theus v. State, 845 S.W.2d 874, 880
(Tex. Crim. App. 1992). Hatter made no such showing, either during trial or in his brief.