**MODIFY and AFFIRM; and Opinion Filed June 13, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-15-00509-CR**
**No. 05-15-00510-CR**

**LUKE HAMPTON, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 86th Judicial District Court**
**Kaufman County, Texas**
**Trial Court Cause Nos. 14-00033-86-F and 14-00034-86-F**

## MEMORANDUM OPINION

Before Justices Francis, Lang-Miers, and Myers
Opinion by Justice Lang-Miers

Appellant Luke Hampton appeals his convictions for aggravated sexual assault of a child involving his four-year-old daughter, Melinda, and indecency with a child involving his six-year-old daughter, Mindy.[1] The jury assessed punishment at incarceration for 50 years and 10 years respectively. In two issues on appeal, appellant argues that (1) the trial court abused its discretion by allowing Melinda to testify remotely by closed-circuit television, and (2) the evidence is insufficient to support the convictions. We resolve appellant's issues against him. We modify the judgment in case no. 14-00033-86-F to reflect the proper statute of conviction and otherwise affirm the trial court's judgments.

---

[1] The children's names are pseudonyms used in the parties' briefing to this Court.

# I. SUFFICIENCY OF THE EVIDENCE

Although we resolve issue two against appellant, we will address it first because, if sustained, it would be dispositive of the appeal.

## A.  Background Facts

At all relevant times, appellant and the children's mother were separated and appellant lived with his parents, whom the children called Grandma and Papa.  The testimony showed that appellant had a history of alcoholism since he was a teenager, he struggled with bipolar disorder that he self-treated with vodka, and he contemplated suicide on more than one occasion.

In mid-November 2013, appellant exercised his regular weekend visitation with the children and returned them to Mother's house on Sunday night.  The following Monday morning, appellant sent Mother a text message asking if Melinda was okay because she was "so sad" the night before; he said his "heart aches."  Mother responded that Melinda was fine and a "happy little camper" that morning.  Mother did not think anything else about the message until a short time later when she was getting ready to go outside.  Melinda came into Mother's bedroom and told her that "Daddy was mean to [Mindy].  Daddy made [Mindy] cry."  Mother asked Melinda about what happened and Melinda said, "Daddy told me he was going straight to hell."  Mother told Melinda that "if something is wrong, you can tell me whenever you're ready."  Mother said Melinda "just blurted out that Daddy asked me to take off my panties and sit on my [sic] face and licked my privates many times."  Melinda said her sister was watching television at the time.  Mother sent appellant a text message, and the following exchange occurred between Mother and appellant throughout that day[2]:

Mother:     Oh fuck luke

Mother:     She just told me

---

[2] We substitute "Mother" and "Appellant" for the personal information contained in the text messages.

| | |
|---|---|
| Appellant: | What? |
| Appellant: | Told u what [Mother]? |
| Appellant: | Whats wrong? |
| Appellant: | U cant say fuck luke and not tell me what |
| Mother: | She told me everything. Everything. Said after you were done you told her you were going "straight to hell" |
| Mother: | Its in your interest not to play dumb at this point. And yes you have a special place in hell now. Your own fucking four year old daughter. You sick fuck. You are an animal. |
| Appellant: | I drank saturday what the hell are u saying!? I didnt do nothing sick. |
| Appellant: | If i did something bad tell me and ill fix myself 4 good. |
| Appellant: | Please. Whatever ive done keep it secret. Im not going 2 b around nomore. |
| Appellant: | My parents are old. Pls dont trouble them with this. Im on my way out. Ive destroyed all reasons in my way. Ive been wanting this 4 a long time. Im tired. It took this 2 justify. I hate life and myself. Please dont tell my parents what i did itll only hurt them more than my death. |

Mother called the Kaufman County Sheriff's Department and was told to take the children to the local children's advocacy center to be interviewed by a forensic interviewer and not to ask the children any probing questions in the meantime.

1.    **The State's Evidence**

In addition to testimony from Mother and local law enforcement, the State presented testimony from the forensic interviewer, the sexual assault nurse examiner, Mindy, and Melinda.

Mindy was the older of the two children and was six years old at the time of the offense. The forensic interviewer testified that Mindy was reserved, shy, and would not open up to her at first about what happened. After a while, the interviewer left the room to talk to local law enforcement, and when she came back, Mindy began talking to her. Sometime later, Mindy told the interviewer that her father was lying on the floor face up in his bedroom and he picked her

up, pulled her shorts and panties down, and smelled her "private areas." Mindy said she had seen her father do the same thing to Melinda. She also said that her father told her he was going to "go bye-bye" and kill himself and "it made her really sad."

The sexual assault nurse examiner testified that she wrote a report about her examination of Mindy, which said, "The child states that her daddy smelled, smelled my private parts and my butt. The child states, 'Daddy did this twice to me.' States all Daddy said was, 'Let me smell your pee and poop.'"

Mindy testified that she did not see her father in the courtroom. She said it had been a long time since she had seen him, and if he was in the courtroom, she did not recognize him. Mindy described what her father did to her in the same way that she described it to the forensic interviewer. She also testified that her father's nose touched her "private" and her "butt" and it made her feel "weird."

The forensic interviewer testified that Melinda was "very talkative" about what happened. She said Melinda described similar incidents to those Mindy described, but in more detail and "[m]ore than simply smelling[.]"

The sexual assault nurse examiner testified that when she asked Melinda if she knew why she was there, Melinda said, "Yes, it's really gross. Do you want to know?" When the nurse said she did, Melinda "said that her daddy told her to take her clothes off and to sit on his mouth. She told me that it had happened four times. And she proceeded to say that he put his nose and tongue in [her] private parts."

Melinda testified at trial by closed-circuit television. She testified that one night when she was staying with her father at Grandma and Papa's house, her father came upstairs to check on them. She said he pulled her pants off and licked her "privates." She pointed to the area between her legs. Melinda said her father "did it to [Mindy] first, then me."

## 2.    The Defense

Appellant presented testimony from his parents and also testified in his own defense. Grandma testified that she did not remember anything unusual happening that weekend. She said the children decided that weekend that their favorite word was "fart" and they giggled about it; they called people "fart face" and said "smell my fart" or "smell my butt." She said the girls kept saying that word until she finally intervened.

Grandma also testified that the children were very noisy that Saturday night. She said they had plans to get up early and go shopping in Mesquite the next day, and she thought she was going to have to tell the girls they could not go if they did not settle down. They did go shopping on Sunday, and later that day, Papa and appellant took the children back to Mother. Grandma said she did not notice any difference between appellant and the children on Sunday, and the children did not seem as though anything was wrong.

Papa testified similarly to Grandma. He testified that on Saturday night he went upstairs to check on the girls because they were so noisy. He told them one was going to have to sleep downstairs if they did not calm down. He testified that he did not see anything unusual or anything that caught his attention when he looked into the room.

Appellant testified that after dinner on Saturday, he and the girls went upstairs to watch television so the girls would fall asleep. He said that night it was hard for the girls to calm down. He said he was lying on his side on a pallet on the floor and the girls were playing behind him. He described the rest of the night as follows:

> They climbed over me because they always fight to be who's on the front. They don't want my back turned to them. [Mindy] climbed over my side. [Melinda] climbed over my head. I said, ["]Oh, stop squishing my head." And she jumped up and – both of them laughing. And they were going through the whole phase of farting on you, smell my farts. So [Mindy] farted on my side, play farted; and [Melinda] sat back on my head again. I told her to stop squishing my head and made [sic] farting noises. I just said, Oh, nasty. And so they just laughed again. She did it again. She sat on the side of my head. I turned my head and I bit her on the thigh and they were fully clothed, nothing strange about it. She – they wouldn't calm down. They kept getting loud. I kept telling them,

You're going to get Grandma and Papa up here; and sure enough, that's what happened.

Appellant testified that after Papa left the room, appellant got milk and a juice box for the girls, the girls watched a movie, and he went to his room. He said he did not see the girls again until the next morning.

Appellant also testified that Melinda "doesn't want to go home to Mom" and both children cry when they have to go home. He said he always sent Mother a text message on Monday after taking the children home asking how Melinda was doing "because she cries all the way home to her mom's house."

Appellant explained how he thought Melinda may have overheard him say he was "going straight to hell," but he denied ever saying that directly to her. He also testified that he thought Mother's reference to him as a "sick fuck" in her text message meant the children had found out he had been drinking that Saturday when they were visiting him. He said while everyone was napping, he took a "few swigs of vodka about lunchtime that Saturday." At one point he testified that he "got drunk at noon" and later that he was only "slightly buzzed" and was sober by nighttime when these incidents allegedly occurred. Appellant testified that he did not know what Mother was accusing him of doing until he was arrested a few days later for "molesting my children."

Appellant also presented evidence that Mother was hypersensitive to allegations of child sexual abuse based on her past and implied that Mother could have planted ideas in the children's heads about conduct that did not happen.

## B. Standard of Review

We review the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found

–6–

the elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

In conducting a sufficiency review, we defer to the jury's role as the sole judge of the witnesses' credibility. *Brooks*, 323 S.W.3d at 899. This standard accounts for the jury's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the evidence. *Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). When the record supports conflicting inferences, we presume the jury resolved the conflicts in favor of the verdict and defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

## C.    Discussion

### 1.    Aggravated Sexual Assault of Melinda

Appellant first complains that the evidence is insufficient to support the conviction for aggravated sexual assault of Melinda. As charged in this case, a person commits the offense of aggravated sexual assault of a child if the person intentionally or knowingly causes the person's mouth to contact the sexual organ of a child younger than six years of age. TEX. PENAL CODE ANN. §§ 22.021(a)(1)(B)(iii), (2)(B) (West Supp. 2015).

Appellant does not challenge any specific element of the offense. Instead, he argues that "there are many inconsistencies with Melinda's statements . . . ." He states that Melinda testified appellant threw her off the bed, but there was no other testimony to confirm that incident. He states that the sexual assault nurse examiner testified that Melinda said appellant licked her "privates" four times, but "there was not any testimony that it happened more than once." And he argues that Melinda testified that "it only happened once."

The jury resolved the inconsistencies in the evidence and any credibility issues against appellant, and we defer to those determinations. *See Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778. Additionally, Melinda's description of the offense, regardless of the number of

times it occurred, is sufficient to support the conviction. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07(a); *see also Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd) ("The testimony of a child victim alone is sufficient to support a conviction for aggravated sexual assault."). Melinda testified that appellant removed her shorts and panties, had her sit on his face, and stuck his tongue in her "privates," which she said was the area between her legs. The jury saw the area to which Melinda pointed as she testified. We conclude that this evidence is sufficient to support the conviction for aggravated sexual assault involving Melinda.

## 2. Indecency with a Child involving Mindy

Appellant next complains that the evidence is insufficient to support the conviction for indecency with a child involving Mindy. As charged in this case, a person commits indecency with a child if the person, with the intent to arouse or gratify the sexual desire of any person, causes a child under age 17 to expose her anus or any part of her genitals to the person. TEX. PENAL CODE ANN. § 21.11(a)(2)(B) (West 2011).

Appellant argues that the State did not prove (1) he was the one who committed the offense because Mindy was unable to identify him in open court, or (2) he had the intent to arouse or gratify his sexual desire because "[t]here was no testimony with regard to conduct, remarks, or any surrounding circumstances that would lead any rational trier of fact to infer that he had the requisite intent." Appellant also argues that Mindy's statements were inconsistent.

Mindy testified that Luke Hampton was her father "but not anymore" and she did not recognize him at trial. Although Mindy could not identify appellant as her father at trial, she testified that her father was the one who engaged in the conduct charged, and it was undisputed that appellant was Mindy's father. We conclude that the State satisfied its burden to prove identity.

With regard to appellant's intent, the evidence showed that appellant told Mindy he wanted to "smell [her] pee and poop" and he touched her "private" and buttocks with his nose in

–8–

doing so. Mindy told the forensic interviewer that her father said "he was going to go bye-bye and kill himself" and it made her sad. He also said he was "going straight to hell." The next day, in text messages with Mother, appellant threatened to "fix" himself for good, asked Mother to keep whatever he had done a secret because he was not going to be around anymore, and asked Mother not to tell his parents because it would hurt them more than his death. He said he had been "wanting this" for a long time, he was tired, and "[i]t took this [to] justify."

We conclude that a rational jury could have inferred that appellant committed the offense with the requisite intent based on his words and actions in committing the offense and in the text messages the next day. *See Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998) ("Mental states are almost always inferred from acts and words."); *McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. [Panel Op.] 1981) ("the requisite specific intent to arouse or gratify the sexual desire of any person can be inferred from the defendant's conduct, his remarks and all surrounding circumstances"). We conclude that the evidence is sufficient to support the conviction for indecency with a child.

We resolve issue two against appellant.

## II. TESTIMONY BY CLOSED-CIRCUIT TELEVISION

In issue one, appellant argues that the trial court violated his right of confrontation guaranteed by the Sixth Amendment when the court allowed Melinda to testify by closed-circuit television.

### A. Background Facts

When Melinda took the witness stand, she refused to look out toward the gallery or at appellant and the State had a difficult time getting Melinda to answer questions. She answered questions such as "What is your cat's name?" but she refused to identify certain parts of a girl's anatomy or speak about what happened to her. She also made "outbursts" that the trial court

described later for the record. After over an hour of trying to get Melinda comfortable in order to testify, she began to cry, and the trial court sent the jury home.

The court brought the lawyers and Melinda into chambers where he talked to Melinda off the record. Later on the record, the court said Melinda "opened up a little bit more to me" in chambers. The court concluded that Melinda was competent to testify, knew the difference between the truth and a lie, and would be able to testify by an alternate method, such as closed-circuit television. The court stated that Melinda "exhibited crying and outbursts and a failure to want to testify" in the courtroom and that under those circumstances, Melinda would be unavailable to the defense for cross-examination. The court asked the State to arrange for Melinda to testify by closed-circuit television the next morning.

The next morning before Melinda testified, appellant objected to the closed-circuit procedure arguing that it violated his right to confront the witness face-to-face. He also objected that there was no evidence that Melinda was unwilling to testify because of his presence as opposed to a general fear of the courtroom.

The trial court overruled the objection, stating that Melinda's inability to testify "rose above mere unwillingness to testify." The court again noted that Melinda was crying and "making outbursts" in the courtroom. He reminded defense counsel that he had said he would be committing "child abuse" by asking her questions. The court said it spent an hour trying to get Melinda comfortable enough to testify and concluded that she was not going to be available for cross-examination by "doing it the way that we did." The court concluded that "there's no other choice but for us to provide the way that we're going to provide this morning for you to be able to question the child." The court said it "believed [Melinda] was in fear of not solely just the courtroom but the fact that the defendant was standing here."

The State responded that it had brought Melinda into the courtroom several times two weeks before trial and told her that appellant would be in the courtroom and showed her where

he would be sitting. The State said Melinda "expressed general concerns and nervousness about that during those interviews with her . . . not one time but multiple times." The State also asked the trial court to note that when Melinda was on the witness stand, she would not make eye contact and would not turn around and look in the general area where she knew appellant would be sitting, but in chambers, Melinda made eye contact, communicated, and did not appear nervous. Additionally, the State noted for the record that it tried for ten to fifteen minutes outside the presence of the jury to get Melinda comfortable, and Melinda "was still showing the same signs[.]" She "would not look in the direction of the defendant. She would not speak to us. She wouldn't answer questions. She made outbursts. She cried. And that was during that period where the only difference would have been that the defendant, Luke Hampton, was present."

The trial court stated, and defense counsel agreed, that Melinda's emotional distress was more than de minimis. The court said "it was severe emotional distress that this child was going through and I'm just unwilling to put the child through it." The court allowed appellant's lawyer, the prosecutor, and the child advocate to be in the room with Melinda as she testified. Appellant and the jury watched on the television in the courtroom as Melinda testified. And the court allowed appellant to contact the bailiff if he needed to talk to his lawyer at any time during the questioning. Using the closed-circuit procedure, Melinda answered questions from both the State and appellant's lawyer without any apparent hesitation.

## B. Standard of Review

We review a trial court's decision to conduct a witness's examination by closed-circuit television under an abuse of discretion standard. *Marx v. State*, 953 S.W.2d 321, 327 (Tex. App.—Austin 1997), *aff'd*, 987 S.W.2d 577 (1999).

## C. Applicable Law

The Sixth Amendment guarantees that an accused "shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. Although the

–11–

Confrontation Clause prefers a face-to-face confrontation, at times that preference must "give way to considerations of public policy and the necessities of the case." *Marx v. State*, 987 S.W.2d 577, 580 (Tex. Crim. App. 1999) (citing *Maryland v. Craig*, 497 U.S. 836 (1990)).

In a case involving sexual assault of a child, the public policy of protecting the child witness from the trauma of testifying "is sufficiently important to justify the use of a special procedure" allowing the child to testify other than by a face-to-face confrontation with the defendant. *Id.* To support the use of this special procedure, the trial court must make the determination that the "use of the procedure is necessary to prevent significant emotional trauma to the child witness caused by the defendant's presence." *Id.* The reliability of the testimony is assured "through the combined effect of the witness'[s] testimony under oath (or other admonishment, appropriate to the child's age and maturity, to testify truthfully), subject to cross-examination, and the factfinder's ability to observe the witness'[s] demeanor, even if only on a video monitor." *Id.*

## D. Discussion

Appellant contends that there was nothing to show that Melinda's reluctance to testify was due to his presence as opposed to a generalized fear of the courtroom or nervousness. He contends that the trial court did not make the case-specific findings required to allow a child to testify by closed-circuit television, and he contends that the trial court should have conducted a hearing outside the presence of the jury to determine whether Melinda would be traumatized by appellant's presence.

Unlike cases in which the State, before trial, moved to employ this special procedure for a child witness, here Melinda was in the courtroom as a witness, and the trial court observed first-hand her demeanor and "outbursts" on the witness stand. Even defense counsel said he would not ask her any questions because it would be "child abuse." The court acknowledged that under those conditions, Melinda was unavailable for cross-examination.

Melinda was six years old at the time of trial. Her refusal to look toward the gallery or in the direction of appellant and answer the State's questions about the incident was in direct contrast to the experiences of the forensic interviewer and the sexual assault nurse examiner. Both of those witnesses were strangers to Melinda, but both testified that she told them about what happened when they asked.

The trial court concluded, after observing Melinda's demeanor in the courtroom and in chambers, that she was suffering severe emotional trauma by having to testify, that her failure to testify was more than just nervousness and a general unwillingness to testify, and that her failure to testify was due in part to appellant's presence. These findings are supported by the record.

The trial court used a procedure allowing Melinda to testify by closed-circuit television. The judge and the lawyers were present with her, she was subject to full cross-examination, and the jury and appellant could observe her demeanor on the monitor in the courtroom as she testified. *See Craig*, 497 U.S. at 857; *Marx*, 987 S.W.2d at 580–81; *Hightower v. State*, 822 S.W.2d 48, 53 (Tex. Crim. App. 1991). Under these circumstances, we conclude that the trial court did not violate appellant's Sixth Amendment right of confrontation. *See Marx*, 987 S.W.2d at 580–81.

We resolve issue one against appellant.

### III. CORRECTION OF JUDGMENT

The judgment in case no. 14-00033-86-F states that the "Statute for Offense" is "§22.021(a)(2)(B)." The statute for the offense as charged in this case and according to the jury's verdict is § 22.021(a)(1)(B)(iii) and (a)(2)(B). We may correct a judgment when we have the necessary information to do so. *See* TEX. R. APP. P. 43.2(b); *see also Wynn v. State*, 847 S.W.2d 357, 361 (Tex. App.—Houston [1st Dist.]), *aff'd*, 864 S.W.2d 539 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd).

Accordingly, we modify the judgment in case no. 14-00033-86-F to reflect the proper statute of conviction.

## IV. CONCLUSION

We modify the judgment in case no. 14-00033-86-F and affirm as modified. We affirm the trial court's judgment in case no. 14-00034-86-F.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

150509F.U05

–14–



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

LUKE HAMPTON, Appellant

No. 05-15-00509-CR       V.

THE STATE OF TEXAS, Appellee

On Appeal from the 86th Judicial District Court, Kaufman County, Texas
Trial Court Cause No. 14-00033-86-F.
Opinion delivered by Justice Lang-Miers.
Justices Francis and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:  the Texas Penal Code provision listed for the "Statute for Offense" is changed to §§ 22.021(a)(1)(B)(iii) & (a)(2)(B).

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered this 13th day of June, 2016.



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

LUKE HAMPTON, Appellant

No. 05-15-00510-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 86th Judicial District Court, Kaufman County, Texas
Trial Court Cause No. 14-00034-86-F.
Opinion delivered by Justice Lang-Miers.
Justices Francis and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 13th day of June, 2016.